## STATE v. BROWN.

No. 2875.   Decided July 13, 1916 (159 Pac. 545).

1. CRIMINAL   LAW—TRIAL—INSTRUCTION—CONTRADICTORY   STATEMENTS—REFUSAL TO INSTRUCT.  Refusal to instruct that a conflict between complaining witness' voluntary admissions and her testimony might be considered in determining her credibility is prejudicial error, where the complaining witness had denied accused's guilt previous to the trial and her story is uncorroborated.   (Page 303.)

2. CRIMINAL   LAW—TRIAL—INSTRUCTION—CONTRADICTORY   STATEMENTS—REFUSAL TO INSTRUCT.  Refusal to instruct that if any witness had made statements material to issues conflicting with his testimony, such testimony might be disregarded except as corroborated by other credible evidence, is prejudicial error where the complaining witness had denied accused's guilt previous to the trial and her story was not corroborated.   (Page 303.)

3. CRIMINAL  LAW—INSTRUCTIONS—CURE  BY  OTHER  INSTRUCTION—CREDIBILITY OF WITNESSES.  Refusal to give the above instructions is not cured by instructing that if any witness wilfully testified falsely his whole testimony might be disregarded, for the inconsistencies may be considered irrespective of whether the witness willfully testified falsely.   (Page 305.)

4. CRIMINAL LAW—SUFFICIENCY OF INSTRUCTION—PRESUMPTION OF INNOCENCE. An instruction that the evidence must remove all reasonable doubt of defendant's guilt is improper because implying that defendant is attended only by a reasonable doubt of his guilt, whereas he is presumed innocent. (Page 307.)

5. CRIMINAL LAW—SUFFICIENCY OF · INSTRUCTION—CURE BY OTHER INSTRUCTION—REASONABLE DOUBT. The above instruction does not constitute reversible error where other portions of the charge correctly state the law. (Page 307.)

FRICK, J., dissenting in part.

Appeal from District Court, Third District; *Hon. M. L. Ritchie, Judge.*

Frank R. Brown was convicted of having carnal knowledge of a female between thirteen and eighteen years of age. He appeals.

REVERSED.

*J. E. Darmer* and *S. P. Armstrong,* for appellant.

*A. 'R. Barnes,* Atty. Gen., and *E. V. Higgins* and *G. A. Iverson,* Asst. Attys. Gen., for the State.

FRICK, J.

The defendant was convicted of the crime of having had carnal knowledge of a female under the age of eighteen years and over the age of thirteen years, which, under our statute, is a felony. He appeals from the judgment.

The first error assigned relates to statements made by the prosecutrix while testifying as a witness for the state. Though it were assumed that the statements were objectionable, yet, no objection or exception having been interposed or taken to the statements, the assignment is not reviewable by us.

At the trial the prosecutrix, a girl of about fourteen years of age, but apparently a well-developed female for that age, testified, among other things, that on the 25th day of January, 1915, she lived in defendant's family, consisting of his wife and a daughter of about the age of the prosecutrix, near Gar-

field, Salt Lake county; that the defendant kept boarders who roomed and slept in small houses, or so-called shacks, which were located on the same lot and near defendant's dwelling where he and his family lived; that on the day aforesaid a little after four o'clock in the afternoon, after the prosecutrix had returned from school, she went to one of the shacks, the one most distant from the dwelling house, in which there were two rooms in which the boarders roomed and slept in two beds; that she went there to make up the beds and was alone in the shack when the defendant came in and that he then and there had sexual intercourse with her; that she was in the room from twenty minutes to half an hour and the defendant a somewhat shorter time.  She also testified, without objection, that the defendant had had sexual intercourse with her on several occasions in the same shack prior to the date aforesaid.  She, however, could not state the precise dates on which the prior acts occurred, but fixed them as nearly as she could remember.  On cross-examination defendant's counsel insisted that the witness, at the preliminary examination, had fixed at least some of the prior dates with certainty and that she at the trial was changing the dates fixed as aforesaid.  The witness admitted that she, on the preliminary hearing, might have given a particular date, but insisted that if she did she did not thereby mean that she could with certainty fix the date or dates on which the prior acts of sexual intercourse took place, and that she gave those dates as nearly as she could remember them.  We have carefully read all of the evidence which is preserved in the bill of exceptions, and we feel bound to state that the discrepancies in the testimony of the prosecutrix with respect to times and dates are less than usual in such cases, and that she seemed quite fair in her statements and gave both the state and the defendant her best recollection with regard to the matters she testified to, and especially with regard to the different dates upon which the alleged prior acts of intercourse took place.  The act upon which the complaint was predicated she always gave as having occurred on the 25th of January, 1915, and there is no contention to the contrary.

In view of the foregoing statements counsel for the de-

fendant, at the trial, contended, and now insists, that the prosecutrix had made contradictory statements respecting material facts in issue and for that reason they requested the court to charge the jury as follows:

"No. 6. I charge you that a witness may be impeached by proof of contradictory statements; and, if you believe that any witness has been successfully impeached, why, then it would be your duty to disregard the evidence of such witness; but it is for you to say whether or not you will believe the witness sought to be impeached or the witness brought to impeach him, the credibility of all witnesses being for you and your consideration. If you believe that any witness has been successfully impeached in reference to contradictory statements upon some material issue in the case—and it must be some material issue in the case—then you would not be authorized to believe him, unless you find that he has been corroborated. He may be corroborated, or he may be sustained by proof of good character, or by other facts and circumstances in the case."

The court refused to give the request and the refusal is assigned as error.

The Attorney General insists, however: (1) That the statements of the prosecutrix are not of that character which would authorize the giving of the foregoing request; and (2) even though it were conceded that the statements were of that character, yet the request was improper, and hence the court committed no error in refusing it.

When all of the testimony of the prosecutrix is considered, as it must be, it must be conceded that there is little, if anything, upon which to base the contention that the statements are contradictory in the sense that that term is usually applied. Assuming, however, that the contention is well founded, the question still remains whether the court erred in refusing to give the request. The request seems to have been taken from the case of *Powell* v. *State*, 101 Ga. 19, 29 S. E. 309, 65 Am. St. Rep. 277. It was there held that the trial court committed no error in charging the jury in the language of the request. The Supreme Court of Georgia, however, arrived at such conclusion after a somewhat lengthy review of the Geor-

gia decisions and after a somewhat exhaustive analysis of the instruction. The court accordingly held that while it would be error to instruct the jury that they must not consider the testimony of a witness who, it is shown, has made conflicting statements upon material issues, and that the jury must be left at liberty to give his testimony such weight, as in their judgment, upon the whole evidence, it is entitled to, or to disregard it in whole or in part, as in their judgment would be just and right, yet, that the charge in question, when properly construed, was merely to that effect. While a trained lawyer might be able to arrive at such a conclusion after carefully reading the instruction in the light of his experience as a lawyer, and in view of his knowledge of the law, yet it seems to us that the obvious and ordinary meaning of the language as it would likely be applied by laymen is not what the court found it to be. It is true that it is said in the charge that it is for the jury "to say whether or not you will believe the witness sought to be impeached or the witness brought to impeach him, the credibility of all witnesses being for you and your consideration," yet it is also said, "If you believe that any witness has been successfully impeached, why, then it would be your duty to disregard the evidence of such witness." The instruction then concludes with the statement that if the jury "believe that any witness has been successfully impeached in reference to contradictory statements, * * * then you would not be authorized to believe him, unless you find that he has been corroborated." The jury is thus clearly told that in case a witness is impeached it is their duty to disregard his evidence, and, further, if they so find they would not be authorized to believe him, unless corroborated. As we view it, the average layman or juror would construe and apply the language of the instruction thus:

"While I am at liberty to believe either one of the witnesses, if, however, I do believe the witness who testified to the making of the contradictory statements, then it is my duty to disregard the testimony of the witness who made them unless such witness is corroborated by other credible evidence."

We can see no escape from such a conclusion. The cases are quite numerous in which it is held that to charge a jury

that it is their duty to disregard the testimony of a witness who, it is shown, has made contradictory statements, or who has been otherwise impeached, upon material issues, or to tell them that they cannot consider any of his testimony unless corroborated, constitutes error. In 2 Thompson on Trials (2d·Ed.) Sec. 2426, the subject is thoroughly discussed and the author there lays down the doctrine we have just stated. To the same effect are *Green* v. *Cochran,* 43 Iowa 545-553; *Harper* v. *State,* 101 Ind. 109; *Addison* v. *State,* 48 Ala. 478; *Higgins* v. *Wren,* 79 Minn. 462, 82 N. W. 859. Moreover, upon both reason and principle such must be the law. It is elementary that the credibility of the witnesses and the weight to be given to their testimony is the exclusive province of the jury. This applies to all the witnesses and not only to those against whose statements no objection is made. ˙It would be almost revolutionary to hold as a matter of law that because some witness comes into court and testifies that another witness has made statements in conflict with his present testimony therefore all that the latter witness testified to should be disregarded by the jury. To so hold would be in direct conflict with the doctrine that the credibility of the witnesses and the weight to be given to their testimony and statements is the exclusive province of the jury. The most that courts can do, or ought to do, in that regard, is to give the jury some plain directions to guide them in arriving at a just result. That is best accomplished by admonishing them that if they find that any witness has, upon any material issue, made statements, either in court proceedings or otherwise, which are in conflict with his present testimony, or if they believe that any witness has willfully testified falsely upon any material issue, that in either event they are at liberty to disregard any part or the whole of his testimony except in so far as the witness may be corroborated by other credible evidence.

In connection with the subject now under consideration it may not be improper to observe that it is not every discrepancy in time or dates that is necessarily a contradiction or constitutes a conflicting statement. Much must be left to the good judgment of the jury in that regard. As is well stated by the author in 1 Bishop's New Crim. Proc., Sec. 1064:

"Honest witnesses oftener mistake dates, the time of the day, and the identity of people seen, than the average of other things to which they testify."

The truth of the foregoing statement is amply vindicated in this case by the following incident: A young woman, a witness for the defendant, who, from a perusal of her testimony, seemed quite intelligent and fair in her statements, but very positive and firm, testified in chief that a certain event occurred on Monday the 28th day of a certain month, and on cross-examination she gave some special reasons why she knew the event occurred on a Monday and on the 28th day of the month. She was utterly surprised and confused, however, when the prosecuting attorney produced a calendar from which it conclusively was made to appear that the event could not have occurred upon both a Monday and on the 28th day of the month, since the 28th day of the month fell upon a Friday. The witness frankly conceded her error, but still insisted that the event occurred on the 28th day of the month. After a careful reading of the record it is not easy to say to what extent this little incident may have affected the result in this case. It clearly illustrates, however, that it would be most unfair and unjust to hold as a matter of law that all such discrepancies in the statements of witnesses would destroy or seriously affect their testimony; and, further, that with regard to such matters they all should be left to the jury under proper precautionary instructions.

In this case the testimony of the prosecutrix and that of the defendant relating to the sexual intercourse were in direct conflict. She, in emphatic terms, stated that he had sexual intercourse with her on the 25th day of January, 1915, and he as emphatically stated that he, neither on that day nor at any other time, had had sexual intercourse with her. It follows, as a matter of course, therefore, that either the defendant or the prosecutrix testified falsely. They could not be mistaken with regard to the fact of sexual intercourse. In view of that the court instructed the jury that if they "shall believe any witness has willfully testified falsely as to any material fact in the case you are at liberty to disregard the whole testimony of such witness" unless corrobo-

rated. In addition to that the court explicitly and fully instructed the jury that it was their exclusive province to determine what witnesses they would believe or what weight they would give to their testimony, stating the rule in that regard for their guidance. We think that in view of all the facts and circumstances in this case the charge was sufficient, and was as favorable to the defendant as he was entitled to have it. It follows, therefore, that the things which it was proper to include in the precautionary instruction, such as the defendant's counsel requested, were substantially covered in the court's general charge to the jury. In view of the conflict between the prosecutrix and the defendant it was a question exclusively for the jury. Her testimony is sufficient if believed. *State* v. *Bayes,* 47 Utah 474, 155 Pac. 335.

The defendant, however, offered two other requests which covered practically the same ground as request No. 6 in different language, and it is urged that the court erred in refusing those two requests. What we have already said practically covers those two requests. We remark, however, that while it would not have been improper to give defendant's request No. 7, yet, as before stated, it was substantially covered by the court in its general charge, and for that reason no error was committed in refusing it.

The last one of the requests, numbered 8, was properly refused both because it was substantially covered in the court's charge, and because, like request No. 6, it contained some improper matter.

Error is also assigned upon the following instruction given by the court:

"Circumstances of suspicion, if they amount to no more than that, or a preponderance merely of evidence against a defendant, is not sufficient to warrant a conviction. The weight of the evidence must be such as to remove from the minds of the jury all reasonable doubt of the defendant's guilt in order to warrant a conviction."

The second or last sentence of the instruction, it is insisted, constituted prejudicial error for the reason, as counsel expresses it, that:

"The court thereby tells the jury that all reasonable doubt

of the defendant's guilt must be removed from their minds by the weight of the evidence before they can convict him. This instruction is so clearly wrong as not to require further comment. Weight of evidence means preponderance of evidence; that is, if the doubt is removed by the preponderance of the evidence, the jury may convict.''

That is all counsel offer upon the subject. We do not think that counsel's construction is the natural and ordinary effect of the language used by the court. Moreover, the court had, in the preceding instructions, already three times told the jury in explicit terms that they could not find the defendant guilty unless they found his guilt established beyond a reasonable doubt. Again, the court, in subsequent instructions, repeated that precaution at least three times. The jury were thus fully informed that it was not merely a preponderance of the evidence upon which they could base a finding of guilty, but they must be satisfied beyond a reasonable doubt of the defendant's guilt before they could convict him. That fact was made so plain and so prominent by the frequent repetitions in the charge that we cannot see how the jury could have been misled by what the court said in the sentence criticized by counsel. It is elementary that instructions can neither be upheld nor condemned by what may be said in one sentence. In the instruction itself, however, the jury were again told that "all reasonable doubt" must be removed from their minds before they could convict the defendant, and that a mere preponderance of the evidence "is not sufficient to warrant a conviction.'' That such doubt must be removed, as the court seems to say, by "the weight of the evidence" could, in view of the whole charge, not have had the effect contended for by counsel; nor could it have misled the jury.

It is also insisted that the court erred in refusing to grant a new trial upon the ground of alleged newly discovered evidence. The state insists, however, that the affidavit in support of the motion for a new trial is insufficient in that it fails to disclose the facts constituting defendant's diligence or to disclose what actions he took to procure the alleged newly discovered evidence to be used at the trial. The authorities are to the effect that merely to state that the party making the

application exercised due diligence, or words to that effect, merely states a conclusion and renders the affidavit fatally defective. Spelling New Tr., etc., Sec. 218; Thompson on Trials (2d Ed.), Sec. 2762; *Bradley* v. *Norris,* 67 Minn. 48, 69 N. W. 624, and cases there cited. The affidavit in this case is merely in the form of a conclusion. Assuming, however, for the purposes of this decision, that the affidavit is sufficient, yet we are of the opinion that the court committed no error for the reason that a part of the alleged newly discovered evidence is what is termed impeaching evidence and the remainder is merely cumulative. It could subserve no good purpose to set forth the alleged newly discovered evidence. It must suffice to say that the defendant produced the affidavits of five persons of lawful age who testified that the general reputation of the prosecutrix for truth and veracity is bad, and that they would not believe her under oath. Another witness, a woman, made affidavit that if a new trial were granted she would testify that she was present at the home of the defendant on the afternoon of January 25, 1915, and there saw the prosecutrix and the defendant. She also details in her affidavit such facts as would make it improbable or unlikely, but not impossible, that the sexual intercourse testified to by the prosecutrix between her and the defendant took place. Substantially the same facts detailed by this witness were, however, testified to by the defendant, by his wife, by their daughter, and by another lady visitor, all of whom were at the defendant's home on the afternoon of January 25, 1915, and at the time it is alleged the charged intercourse took place. The testimony of the witness was therefore merely cumulative. That is, a mere repetition of what the other four witnesses had testified to, while that of the five persons was clearly impeaching and nothing more. The authorities are very numerous, and practically unanimous, that it is only in exceptional cases, of which the instant case is not one, that new trials will be granted for alleged newly discovered evidence which is merely impeaching or cumulative, or both. This court is firmly committed to that doctrine, as appears from the following cases: *Klopenstine* v. *Hays,* 20 Utah 46, 57 Pac. 712; *State* v. *Molitz,* 40 Utah 447, 122 Pac. 86; *State* v. *Montgom-*

*ery,* 37 Utah 515, 109 Pac. 815; *State* v. *Moore,* 41 Utah 247, 126 Pac. 322, Ann. Cas. 1915C, 976. To the same effect are *Harper* v. *State,* 101 Ind. 109; *Rains* v. *Ballow,* 54 Ind. 79; *Dodds* v. *Vannoy,* 61 Ind. 89; *Arwood* v. *State,* 59 Ga. 391; *McDonald* v. *Coryell,* 134 Ind. 493, 34 N. E. 7. In the Georgia case there was but one witness for the state, and it was that witness that the newly discovered evidence sought to impeach. Notwithstanding that the court held that a new trial should not be granted. In this case there are, however, some facts in the record which would make the impeaching evidence less effective than in that case. The foregoing cases make it clear that if all that defendant's counsel contend for in their motion for a new trial be conceded, yet, under the overwhelming weight of authority, we are not authorized to grant a new trial. It is, however, clearly made to appear from the testimony of both the defendant and his wife, and possibly other witnesses, which was received without objection, that the prosecutrix was a dutiful, reliable, and obedient girl, and that they knew nothing derogatory to her character and had heard nothing against her until after the present charge was preferred.

In conclusion the writer feels constrained to say that after a careful reading of the whole evidence and proceedings, and judging alone from the face of the record, if he had been a juror he would have found the defendant not guilty. The jury were, however, in a much better position to judge of the real merits of the case than is he. Again, I desire to concede that, judging alone from the face of the record, including the proceedings in support of the motion for a new trial, if I had been the trial judge I should have felt inclined to grant the motion for a new trial. Here again the trial judge was in a much better situation to judge than I am, and in view that there is no substantial legal error shown which, in my judgment, affected any of the substantial rights of the defendant we, as an appellate court, have no authority to interfere with the verdict of the jury or the judgment of the court based thereon.

Since writing the foregoing my Associates, in separate opinions, have given their reasons for arriving at a conclusion

different from mine. After again carefully considering the whole record I am still unable to yield my former judgment. After all, whether the trial court committed reversible error or not in refusing to charge as requested, in my judgment, depends wholly upon how one regards the weight or probative force of the evidence. I say this because in this case there is positive and direct evidence in support of as well as against the finding of the jury. The contradictory statements of the prosecutrix were fully explained by her and all the circumstances why and how she made them were before the jury and they were fully advised with respect thereto. The prosecutrix either told the truth at the trial or she did not. Whether she did or did not had to be determined from all that occurred at the trial. The question, therefore, was one peculiarly for the jury. It is impossible in an opinion to reflect all that occurs at a trial which might influence the judgment of the triers of fact upon questions of fact. The circumstances may be such that one witness is, and ought to be, believed, notwithstanding he has made contradictory statements which are satisfactorily explained to the jury, as against another witness who has made no conflicting statements. No doubt, under ordinary circumstances, the credibility of a witness is affected in case he has made contradictory or conflicting statements. This, however, is a matter of such general knowledge that even school boys who have attained the age of ten years are fully aware of it and constantly apply it in their daily conduct and intercourse with their playmates and associates. Let one of them make contradictory statements concerning a fact and his statements will at once be discounted by his playmates. This, too, without any instruction or admonition from any one. Yet when those same school boys become business men and their knowledge and experience have increased, then it is solemnly assumed that they no longer are capable of weighing the testimony of a witness who has made conflicting statements without an instruction from a court. I freely concede that such instructions have many times been given and have as often been approved by the courts, and that judgments have even been reversed because they were refused; but to do so under all the circum-

stances in the case, in my judgment, constitutes an unwarranted interference with the verdict of the jury for the reason that in effect it is but another way of saying that the jury, upon the evidence, should have found contrary to what they did find. I desire to add, however, that while such precautionary instructions can do no harm, they, in my judgment, have not the slightest effect upon the average juror. When, however, as here, there is direct and positive evidence in support of the jury's finding and the parties have been given every latitude and opportunity to lay before the jury all the facts and circumstances concerning the alleged offense, and having also fully explained to the jury the relationship of the witnesses and their statements and conduct preceding the trial, I cannot see how either the giving or withholding of such an instruction could influence the jury or affect their verdict. I am of the opinion, therefore, that the judgment should prevail. In view, however, that my associates are of a different opinion the judgment is reversed and the cause is remanded to the district court of Salt Lake county, with directions to grant a new trial.

McCARTY, J.

The only evidence against the defendant was the uncorroborated testimony of the prosecutrix. Her father, who was a witness for the state, testified that, before she went to live at the home of the defendant, he had "neglected the child"; that she had "been practically on the street, running free and doing as she pleased"; that he "was advised to get her a place to stay"; and that he "knew she was going wrong." The prosecutrix testified:

That she, on several occasions, had sexual intercourse with defendant prior to the commission of the act for which he was tried and convicted; that on one occasion, in July, 1914, the act occurred between 2 and 3 o'clock in the afternoon; that "I was cleaning up the room. Think Miss Wall was working there at the time. Mr. Brown was sitting by the dining room table when I went out. Think Miss Wall was in the kitchen. I think Mrs. Brown was sitting in the dining room with Mr. Brown. We were sitting at the table, talking, after lunch. I

took the broom and went out about 2 o'clock, I guess. * *' *
The screened porch of the kitchen looks right into these doors.
You can see plainly from the kitchen right into the shack.
* * * From where Mrs. Brown, Miss Wall and Mr. Brown
were to the * * * shack you could hear each other talk,
pretty near. The windows were up in July, and doors open.
Mr. Brown came in and he pushed me over on the bed and
we began fooling and scuffling around in there and the act
took place. I think he was there five or ten minutes. I went
right on cleaning and he helped me straighten up the bed.
He went into the house and I went into the other shack."

She testified:

That on another occasion "the act occurred just after noon.
* * * Georgia (defendant's daughter) was in the kitchen,
and Mrs. Brown, doing the dishes. * * * I just came from
my lunch. He came out with me to fix down the carpet. He
fooled around about 45 minutes. Mrs. Brown came in while
he was helping me put down the rug, but went right back to
the house. * * * The windows from the dining room and
kitchen are within 15 or 20 feet of the shack. The windows
were open, but we closed the door. * * * We could hear
them all the time doing the dishes. If we were talking in an
ordinary tone of voice I expect they could hear us."

Regarding the circumstances under which the prosecutrix
claims the act for which the defendant stands convicted was
committed she testified in part as follows:

"I got home from school on January 25th about 10 minutes
of 4; went in the kitchen and got something to eat. Mrs.
De Hart, Mr. and Mrs. Brown were in the kitchen. Mr. and
Mrs. Brown were getting supper for the boarders. The other
lady was a dressmaker. I took the broom and went out to
clean up the rooms ('shacks'). * * * I was there sweep-
ing and Mr. Brown came and asked me if he 'could have a
piece.' I told him, 'Well, I don't know.' I said I was afraid
Mrs. Brown would come; so then, as we were in there, why,
we had sexual intercourse, and when that was over, why, Mr.
Brown went to the house and I went to my work. * * * I
think this was on the birthday of Georgia Brown. * * *
There was a birthday cake for Georgia at the baker's. * * *

I remember distinctly that I went up with Georgia to the baker's and got this birthday cake. It was somewheres about 5 o'clock. * * * Georgia and I went out coasting on the hill. That was while supper was on. I was out coasting about 20 minutes. I wasn't well; menstrual period came on the day before. Mrs. Brown fixed me up that afternoon.''

Earl Peterson, a roomer or lodger of the Browns, and who occupied the shack in which it is claimed the offense was committed, was a witness for the defendant and testified in part as follows:

''On January 25, 1915, Mr. Brown and I moved one of the stoves out and put a new one in my room. That was all we did except clean it up, when we left. * * * Mr. Brown fixed up the room—made the bed. I went to work on that day at 3:30. Started for work between 2:30 and 3 o'clock.''

The defendant and three other witnesses, two of whom were his wife and daughter, testified to facts tending to show, and, if true, do show, that notwithstanding defendant was at home on that day (January 25, 1915) assisting his wife with the work in the kitchen, preparing the meals for boarders, he had no opportunity to commit the criminal act for which he was tried and convicted. The testimony of the prosecutrix regarding other acts of sexual intercourse between her and defendant is contradicted in every essential particular by the evidence of defendant and his witnesses.

The prosecutrix further testified as follows:

''When I was brought to the city by the juvenile (court) authorities I did not tell them about Brown's acts. When Mrs. James said she knew about it, then I told her. She asked me first the first day I was up here. I told her no at first, then she went to Garfield and found out; then I told her yes, that it was so. I did not deny it about all the other six at that time—just denied it about Mr. Brown. They brought me to court *Tuesday and it was the next Monday before I admitted that anything had taken place between me and Brown.*''

Her father was called as a witness by the state and testified, and she admitted:

That she at first told him that the defendant was innocent. ''I asked her if there was anything about it (referring to her

alleged illicit relations with defendant) and she said, 'No, sir.' Afterwards * * * she told me there was, because they brought Frank (defendant) into jail.''

Defendant requested the court to charge the jury as follows:

''The court instructs the jury that if they believe from the evidence that any witness in this case, at a time prior to this trial, had made voluntary admission in regard to the facts thereof, and that such admission is in conflict with the evidence given by such witness at the trial of this cause, such conflict may be considered by the jury for the purpose of determining the credibility of the testimony of such witness, and the weight to be given to the evidence of such witness.''

The court not only refused to instruct the jury as requested, but, as I read the record, failed to charge the jury at all on the point covered by the request. This is assigned as error.

I am of the opinion that the requested instruction should have been given. The only incriminating evidence against the defendant was that given by the prosecutrix, and her evidence in that regard was not corroborated in any particular. This is conceded by the state. The Attorney General, in his printed brief, says:

''It is true that the verdict of the jury stands on the uncorroborated testimony of the prosecuting witness.''

The statements of Sir Matthew Hale in regard to the crime of rape, which have generally, if not universally, been approved by the courts and text-writers, are apropos to this class of cases, namely, that ''it must be remembered that it is an accusation easily to be made and hard to be proved and harder to be defended by the party accused, though never so innocent,'' and that we should ''be the more cautious upon trials of offenses of this nature, wherein the court and jury may with so much ease be imposed upon without great care and vigilance; the heinousness of the offense many times transporting the judge and jury with so much indignation that they are overhastily carried to the conviction of the person accused thereof by the confident testimony, sometimes of malicious and false witnesses.'' 33 Cyc. 1485. And if the judgment in this case is to remain undisturbed it may be said

with equal, if not greater, force of the crime of carnally
knowing a female under the age of 18 years in this state;
that "it is an accusation easily to be made" and in all cases
where the female is a willing witness easily to be proved and
impossible to be defended by the party accused, however in-
nocent he may be. In such cases all that is required is for
the prosecutrix to testify that the accused had an opportunity
to and did commit the crime. And when, as in the case at bar,
the defendant testifies in his own behalf and denies that he
defiled the prosecutrix or otherwise illtreated her and pro-
duces witnesses whose testimony, if true, shows conclusively
that he is innocent, the jury may assume, as they must have
done in this case, that the parties had the opportunity to com-
mit the offense and the inclination to do so, and that the de-
fendant gave way to his evil propensities, hence the testimony
of the prosecutrix must be true. It seems that an opportunity
for the defendant to commit the crime was alone sufficient to
convince the juvenile court officers, referred to by the prose-
cutrix in her testimony, of his guilt. When the prosecutrix
was first taken into custody she implicated—accused—six
other men or boys of having had sexual relations with her,
but stated that the defendant had not defiled or otherwise
mistreated her. While she was being held in custody the
juvenile court officer mentioned went to Garfield to investi-
gate the charges and on her return stated to the prosecutrix
that "she knew about it"—referring to the alleged criminal
relations between defendant and the prosecutrix. Then, for
the first time, the prosecutrix stated that she had been defiled
by the defendant. We have a right to assume that if the
juvenile court officer had been informed of any fact tending
to establish defendant's guilt other than the mere opportunity
for him to commit the crime she would have advised the dis-
trict attorney and her informant would have been subpoenaed
and called by the state to testify in the case. I do not think
the evidence shows that the defendant had an opportunity to
commit the particular criminal act for which he was tried and
convicted. The circumstances under which the alleged crime
was committed, as related by the prosecutrix, the character of
her illness at the time, the lack of privacy because of the

unobstructed view of the shack and its close proximity to the kitchen in which were defendant's wife and daughter, a dressmaker and another lady, to say nothing of the conflicting statements made by the prosecutrix respecting her alleged relations with the defendant, make her story, as I view the case, improbable, unreasonable, and unbelievable. For the purpose of determining whether defendant's request No. 7 for instruction should have been given, I shall assume, for the sake of argument, that the evidence shows that the defendant had an opportunity to commit the particular criminal act for which he was tried. I am unable to conceive or imagine how it would be possible in this kind of a case, where the reputation of the prosecutrix for truth and veracity is not directly assailed and impeached, for the party accused to make a stronger or better showing in his own behalf than was done by the defendant in the case at bar. As I have stated, the defendant denied he had had illicit relations with the prosecutrix. His wife and daughter and a lady who was visiting with the Browns on that day (January 25, 1915) testified that they were in the house with the defendant at the time it is claimed the act took place, and that he was engaged with his wife preparing supper for the boarders. And their evidence is to the effect that he was not in the shack after Peterson left to go to his work at two-thirty o'clock, and that he was not alone with the prosecutrix at all that afternoon. Moreover, while there is no direct evidence on the point, yet the only reasonable inference deducible from the evidence as a whole is, that defendant is a kind father and a devoted husband. The prosecutrix testified that defendant and his wife "seemed to take an interest" in her and that they fitted her out with clothes. Mrs. Brown, in giving her testimony, spoke kindly of the girl, and, among other things, said:

"When I asked her to do something she would do it. * * * I never had reason to suspect her or doubt her, and never had any difficulty with her; never had any unkind words."

I refer to these matters because they tend to illustrate the character and kind of people the Browns are. But it seems that these traits of character are of no avail to a defendant in this kind of a case. Mrs. Brown further testified:

That the prosecutrix associated with and occupied the same bed with her daughter, Georgia Brown, who is about the same age as the prosecutrix. "I generally knew where she and the little girl were. I knew what she was doing when she was about my place mostly all the time. If she went to a shack I would know it. I can see every shack. On the afternoon of the 25th the beds had been made up about 2:30. When Mr. Peterson went to work the beds were all made." That about four o'clock that afternoon she told the girls they might go coasting and that the prosecutrix said she wasn't well. "I said, 'Well, wrap up good and it won't hurt you.' I knew that she was in her menstrual period. For three days I helped fix her up."

I have copied somewhat copiously from the evidence because it was necessary to refer to the facts in detail in order to get a clear understanding of the different phases or angles of the case. Viewing the evidence in the light most favorable to the theory advanced by the state, we have a case (1) in which the prosecutrix, according to her own testimony, promiscuously indulged in sexual intercourse with no compunctions or qualms of conscience whatever, and with as much indifference as a person ordinarily steps to a soda fountain and drinks a glass of soda water or partakes of a dish of ice cream; (2) the crime was committed; if committed at all, when the prosecutrix was menstruating, thereby making the act both loathsome and unnatural; (3) when the prosecutrix was taken into custody by the juvenile court officers and questioned by them she accused six men or boys of having carnally known her, but stated that the defendant had not, thus, or otherwise, mistreated her; (4) when she had been in custody a week one of the juvenile court officers went to Garfield, the place where it is claimed the delinquencies of the prosecutrix occurred, to investigate her conduct. The juvenile court officer, on her return from Garfield, informed the prosecutrix that she "had found out at Garfield that it—(her immoral relations with the defendant)—was so," and that she "knew about it." Then the prosecutrix, for the first time, implicated the defendant. Under these circumstances the defendant was entitled to have the court instruct the jury that

they might, in determining the weight that should be given the testimony of the prosecutrix, take into consideration the conflicting and contradictory statements regarding her alleged illicit relations with the defendant. 2 Thomp. on Trials (2d Ed.), Sec. 2426; *Henderson* v. *State*, 1 Tex. App. 432; *Hall* v. *State*, 122 Ala. 85, 26 South. 236; *Rose* v. *Otis*, 18 Colo. 59, 31 Pac. 493. And especially so in view that the juvenile court officer pursued a course to induce the prosecutrix to impli- cate the defendant that was manifestly unfair to him and which, under the peculiar facts and circumstances of the case, amounted to undue influence. In a case of this kind where, as here, the prosecutrix shows by her own testimony that she has no conception whatever of the enormity of the crime of which the defendant was convicted and who is aware that she may be committed to the industrial school, generally spoken of as the "reform" school, her fear of being commit- ted to that institution may create a strong incentive to impli- cate parties, regardless of their guilt or innocence, with her delinquencies, provided she gets the impression that by so doing she will gain favor with those who have her in charge and be treated leniently by them. After having made one confession, like Topsy in Uncle Tom's Cabin, she is apt to keep on confessing by adding additional names to her list of offenders so long as she thinks it is to her advantage to do so. Therefore, in cases of this kind, the fullest latitude should be given the defendant to avail himself of every right recog- nized by the law in the presentation of his defense and his theory of the case to the jury. This court, in a similar case (*State* v. *Hilberg*, 22 Utah 39, 61 Pac. 218), took occasion to invite attention to the great disadvantage in which a defend- ant in this class of cases is placed and the ease with which he may be convicted, however innocent he may be, and, in the course of the opinion, makes the following pertinent observa- tions:

"We do not overlook the danger attending prosecutions un- der this act. The rules of law governing trials under this statute are more stringent and less flexible than those ap- plicable in other criminal cases. An accusation under this statute is easily made. The offense, if committed, is generally

in secret. The general character of the prosecutrix cannot be attacked. Specific acts of unchastity on her part cannot be shown. Her testimony as in many other cases where she may be an accomplice does not require corroboration in order to obtain full credit, and the woman who participates in the act is not criminally liable therefor. Under such circumstances the charge when made is hard to disprove and difficult to defend against no matter how innocent the accused may be. While the protection of the honor and chastity of young women is of paramount importance to the state, and every effort should be made to fully care for and protect it, yet in such prosecutions full latitude should be given the accused to discover the truth by cross-examination and otherwise, so as to enable him to defend against any unjust accusation.''

Since the submission of the foregoing observations to my Associates, Mr. Justice FRICK has written an addendum to his opinion, wherein he says:

''The contradictory statements of the prosecutrix were fully explained by her and all the circumstances why and how she made them.   *   *   *   The circumstances may be such that one witness is, and ought to be, believed, notwithstanding he has made contradictory statements which are *satisfactorily explained* to the jury, as against another witness who has made no conflicting statements. No doubt, under ordinary circumstances, the credibility of a witness is affected in case he has made contradictory or conflicting statements. This, however, is a matter of such general knowledge that even school boys who have attained the age of ten years are fully aware of it and constantly apply it.'' (Italics mine.)

Mr. Justice FRICK has not, either in his original or in his supplemental opinion, pointed out wherein the prosecutrix ''satisfactorily'' or ''fully explained why and how'' she came to make the contradictory statements. Any person, be he lawyer or layman, who will take the time to read the record, will readily observe that the prosecutrix made no explanation whatever regarding the contradictory statements she made to her father of her alleged unlawful relations with the defendant. Nor did she ''fully,'' ''satisfactorily,'' or other-

wise explain why she, for eight days after she was taken into custody, failed to implicate the defendant and persistently, during that time, denied having had illicit relations with him. In view of what I regard to be the unsupported and unwarranted deductions made by Mr. Justice FRICK from the testimony of the prosecutrix on this point, I shall again refer to her evidence, wherein she said:

"She (the juvenile court officer) asked me first, the first day I was up here. I told them no at first. * * * I did not deny it about all the other six at that time. I just denied it about Mr. Brown. * * * They brought me to court Tuesday, and it was the next Monday (eight days) before I admitted that anything had taken place between me and Mr. Brown. * * * Mrs. James said she had found out at Garfield that it was so; * * * said she knew about it. Then I told her it was so."

Mr. Justice FRICK, in his main or first opinion, says:

"When all of the testimony of the prosecutrix is considered, as it must be, it must be conceded that there is little, if anything, upon which to base the contention that the statements are contradictory in the sense that that term is usually applied."

Conceding, for the sake of argument, that "school boys who have attained the age of ten years," and occasionally a jurist, may be found who are unable to discern anything in the conflicting, inconsistent and irreconcilable statements of the prosecutrix that is contradictory "in the sense that that term is usually applied," it nevertheless would be difficult for a person gifted with a versatile and vivid imagination to conceive of statements more contradictory and more at variance than those of the prosecutrix wherein she first absolutely and unqualifiedly denied and later asserted that she had illicit intercourse with the defendant. Mr. Justice FRICK, in the concluding paragraph of his main or first opinion, says:

"That after a careful reading of the whole evidence and proceedings, and judging alone from the face of the record, if he (the writer) had been a juror he would have found the defendant not guilty."

And again:

"Judging alone from the face of the record, including the proceedings in support of the motion for a new trial, if I had been the trial judge I should have felt inclined to grant the motion for a new trial."

These observations by Mr. Justice FRICK, I think, clearly indicate that he is of the opinion that the defendant was not properly convicted, because the only ground upon which he would have been authorized, under his oath if he had been a juror, to find the defendant not guilty is, that the evidence is insufficient to justify his conviction.   And if he had been the trial judge he would have been justified in granting a new trial only on one or more of the following grounds:   (a) That the evidence is insufficient to support a verdict of guilty; (b) that some error prejudicial to the rights of the defendant was committed during the trial of the cause; or (c) that the showing made by the defendant of newly discovered evidence on motion for a new trial entitled him to have the verdict set aside and a new trial granted.   It seems that the reason advanced by Mr. Justice FRICK for not concurring in the reversal, if I correctly understand his position, is that the trial judge saw and heard the witnesses testify and was therefore more capable of determining their credibility and the weight that should be given their testimony than we are.   This rule has no application where a motion, as in the case at bar, is heard on affidavits of newly discovered evidence.   In such case the trial court is in no better position to consider and weigh the affidavits than is the appellate court.

It is suggested in the brief filed by the Attorney General "that it is not probable that had the evidence proffered by Louise D. Hart been given at the trial the result would have been different," and hence the new trial was properly denied. She is the dressmaker herein referred to who was at the home of the defendant at the time it is claimed the crime in question was committed.   The facts set forth in her affidavit, if true, show conclusively that the defendant is innocent, and are in accord with the testimony of the defendant and his wife and daughter and that given by Agnes Williams, who, as hereinbefore stated, was visiting with defendant and his

family at the time it is alleged the offense was committed. I agree with the Attorney General that if the evidence of Louise D. Hart had been produced at the trial the result would have been the same. Notwithstanding the conditions and circumstances described by the prosecutrix under which she testified the criminal act was committed, when there was no opportunity for her to have sexual intercourse with the defendant except in the hearing, and in the full or partial view of the defendant's wife and other parties who were present at the time; and notwithstanding that her testimony that she then had sexual intercourse with the defendant was, because of her illness, highly improbable and almost unbelievable, yet the jury having accepted as true her self-impeached testimony it would be unreasonable to expect that the testimony of any number of reputable witnesses showing the defendant to be innocent of the particular crime in question would have produced a different result. In my opinion this is one of the strongest arguments that can be produced that the trial court abused its discretion by refusing to grant a new trial. Should the judgment in the case at bar be approved, then, I submit, the law governing this class of cases is a menace to the good name and liberty of every man, however honest and virtuous he may be, who has a family and takes into his household and treats as a member thereof a homeless and motherless girl who is in any degree inclined to be wayward. A few convictions on evidence such as the record here discloses would have a tendency to, if they did not absolutely, close every respectable home in the State of Utah against these unfortunate girls, because, under the rule thus declared, if a man who has taken a motherless and somewhat wayward girl into his home should incur the displeasure of his ward or arouse the unfounded suspicion of some overzealous juvenile court officer he is in danger of being accused of a heinous crime and convicted thereof on the unsupported and uncorroborated evidence of a self-impeached, discredited and irresponsible wayward girl, regardless of how improbable and unbelievable her testimony may be. And that, too, notwithstanding he may be fortunate enough to show by evidence of credible witnesses, as in the case at bar, that he had no

opportunity to commit, and did not commit, the criminal act of which he is accused.

In conclusion I remark that to permit the judgment in this case to stand would be a reflection upon and an impeachment of our judicial system. For the reasons stated I concur in the reasoning of the Chief Justice and in the conclusions, reached by him on the questions of law discussed, and also join with him in reversing the judgment and directing that a new trial be granted.

STRAUP, C. J.

I think the judgment should be reversed, not for insufficiency of evidence, but for errors in refusing requests to charge. There is no doubt that a witness may be discredited or impeached, or his credibility and the weight **1, 2** of his testimony affected, by material inconsistencies between his testimony and statements formerly made by him, and when such are shown the court, on proper requests, should give instructions with reference to the law or principles applicable thereto, especially in a criminal case when the conviction is dependent upon the testimony alone of the prosecuting witness whose testimony is at variance with statements formerly made by him. 2 Thomp. on Trials, Sec. 2420; Blashfield Inst., Sec. 249; *Harris* v. *State,* 96 Ala. 24, 11 South. 255; *O. & M. Ry. Co.* v. *Craucher,* 132 Ind. 275, 31 N. E. 941; *Smith* v. *State,* 142 Ind. 288, 41 N. E. 595; *Herstine* v. *Lehigh Valley R. R. Co.,* 151 Pa. 244, 25 Atl. 104. Here the state, for a conviction, depended solely upon the testimony of the prosecuting witness. To support the issue on its behalf it offered no other evidence. There are undoubted inconsistencies between her testimony and statements formerly made by her, not as to mere dates, or other immaterial matters, but as to material facts, the charged criminal act itself. She testified most directly that the defendant, on the 25th of January, 1915, and on prior occasions, carnally knew her. But she also testified that when she thereafter was taken into custody by the juvenile court officers she told them, and told her father, that the defendant had not carnally known her and that he was innocent; and while in custody for a week

or more maintained his innocence until the defendant himself was arrested and taken into custody, when she finally declared his guilt. Since she herself admitted making the statements out of court inconsistent with her testimony, there was no occasion to call others to show the making of them. The state, however, as to this, in rebuttal, called her father, who, in response to questions asked him by the district attorney testified that:

"I don't say that I believe they (the juvenile court officers) had prompted the girl to testify against him (the defendant) falsely, but that they had instructed her what to say. When I first went after her she told me that this man was innocent. Q. Then you told her that you knew something about it, didn't you? A. No; I never said a word about that. I asked her if there was anything about it, and she said, 'No, sir.' Afterwards, when she was going to have a hearing, she told me there was because they brought Frank (defendant) into jail. The conversation came up and Brown wondered whether she would be allowed to tell the truth. That was a month or six weeks ago."

There thus is no question but that the girl, as to the criminal act itself, made statements out of court wholly inconsistent with her testimony in court. She herself admitted it, her father testified to it, and no one denied it. In view of that, and that the state, for a conviction, depended solely upon her testimony, the defendant was entitled to something more than mere stock insructions, but to a direct charge respecting such inconsistencies and the effect, not that should, but that might, be given them. Though it be conceded that his request No. 6, set forth in the opinion by Mr. Justice FRICK, is too broad, and 'because invading the province of the jury is improper, still I think his request No. 7, set forth in Mr. Justice McCARTY'S opinion, ought to have been given. It in effect is, that if any witness had made voluntary admissions or statements out of court in conflict with his testimony in court, such conflict was a proper matter for the jury's consideration in determining the credibility of the witness and the weight to be given his testimony. The request pointedly and properly directed the jury's attention to the purpose and effect for

which such conflict or inconsistencies could be considered as affecting the credibility of the witness and the weight of his testimony. When there is evidence, as here there is, even undisputed, rendering such a request applicable, I see no good reason for refusing it. *Rose* v. *Otis,* 18 Colo. 59, 31 Pac. 493. Whatever argument may be advanced that to give the defendant's request No. 6 would be to invade the province of the jury—that if a witness be successfully impeached it was the "duty" of the jury to "disregard" his evidence, that they "would not be authorized to believe him" unless corroborated—is not in any particular applicable to request No. 7, nor to No. 8, which the court also refused, and which is:

"If any witness in the case has at another time and place made statements, material to the issues in this case, at variance with his testimony while on the witness stand and before you, then you are at liberty to disregard the whole of such witness' testimony except in so far as he is corroborated by other credible evidence."

That request is supported by *Blotcky* v. *Caplan & Nathan,* 91 Iowa 352, 59 N. W. 204.

It, however, is urged that all this was covered by the stock and printed instructions given in every civil and criminal trial in this state since statehood, that the jury are the sole judges of the facts, the credibility of the witnesses, the weight of their testimony, and that:

"If you shall believe any witness has willfully testified falsely as to any material fact in the case you are at liberty to disregard the whole of the testimony of such witness except as he may have been corroborated by credible witnesses or credible evidence in the case."

Thus the defendant's request, that inconsistencies between statements of a witness out of court and his testimony in court should be considered as bearing on the credibility of the witness and the weight of his testimony, or, as the jury might determine, the whole of the testimony of such witness could be rejected unless corroborated, was refused and a charge given that the jury could only so consider and regard such inconsistencies in the event they found that the witness had

"willfully testified falsely." But the rule is, and as stated in 40 Cyc. 2762, and supported by cases there cited, that:

"The fact that a witness has made statements inconsistent with or contradictory to his testimony is proper to be considered as bearing upon his credibility, even though the jury do not believe that the testimony thus contradicted was intentionally false. But proof of such statements is only evidence tending to impeach the witness, leaving it for the jury to determine under proper instructions whether the impeachment has been successful, and to what extent the credibility of the witness is affected and does not require that his testimony be rejected. So the jury may beleive the witness notwithstanding his contradictory statements, even though his testimony is not corroborated. On the other hand, a witness' contradictory statements may justify the jury in not believing him, although they should not disregard or refuse to consider his testimony unless they consider it wilfully false, even though it is not corroborated."

Hence, though the girl may not have "willfully testified falsely," still the inconsistencies between her statements out of court and her testimony in court could, nevertheless, properly be considered as affecting her credibility and the weight to be given her testimony. But, as seen, that element as so requested was not embraced in the charge, and hence the substance of the requests in such particular was not given.

The requests were not objectionable because invading the province of the jury. The seventh did not, because of the stated or assumed inconsistencies, require or bind the jury to reject the testimony of the witness; nor did even No. 8, for that merely stated that the jury were "at liberty to disregard" the testimony, which implied, not a requirement or behest so to do, but a freedom and choice to accept or reject it as they saw fit.

Now, as to prejudice. That, as to, such a question as this, is dependent upon the particular facts of the case. Here, as already observed, the inconsistencies relate to the testimony of the state's only witness. She was a mere child, but fourteen years of age, an age when many children are of a most impressionable nature, quite susceptible to yielding influences, and more or less moved by impulses. While testimony of some children of that age is entitled to the same weight and credit, and is as reliable as that of an adult, yet of others

is more or less doubtful and unreliable, not because they are willfully untruthful or knowingly testify falsely, but because of their impulses, indiscretion, and of the environments and influences surrounding them. Hence, as to such a witness, inconsistencies of statements out of court with her testimoney in court, though they may not be regarded to the extent as carried by some courts (*Johnston* v. *Sochurek*, 104 Ill. App. 350)—that the one statement wholly negatives or neutralizes the other so that the testimony unless corroborated is entitled to no weight—still, when considered and weighed by the jury in the particular case, the inconsistencies may, nevertheless, be regarded by the jury of such controlling importance as to accomplish just such result. On the other hand, had the jury been properly guided they might have found that the girl's statements out of court were prompted by motives to shield the defendant, but that she, seeing him under arrest and believing that the state had evidence of guilt independently of her testimony, finally admitted his guilt, and thus that her statements so made out of court did not materially impair her testimony in court. Of course, all this was for the jury. But they needed guidance. Without it a juror may well enough understand that such inconsistent statements are to be considered and some effect to be given them, but unless guided may regard them as evidence of the fact declared, and so regarding them may for that purpose think them of but little or no weight, or give them undue weight instead of regarding them as the juror should, as affecting and as striking at the credibility of the witness and the weight to be given his testimony. And then the jury, in view of the pointed inconsistencies of the prosecutrix and as applicable thereto, were misdirected because in effect told the inconsistencies could be considered on credibility only in the event the witness had "willfully testified falsely."

Complaint also is made of this charge:

"Circumstances of suspicion, if they amount to no more than that or a preponderance merely of evidence against a defendant, is not sufficient to warrant a conviction. The weight of the evidence must be such as to    **4, 5**

remove from the minds of the jury all reasonable doubt of the defendant's guilt in order to warrant a conviction.''

The proposition is not happily put. It is based on wrongly assumed premises that the jury, at the first instance, have a reasonable doubt as to the defendant's guilt, which, to warrant a conviction, must be removed by the weight of the evidence. This is not equivalent to the proposition that the jury, at the first instance, are required to presume the defendant innocent and that before they are warranted in convicting him they, upon the evidence adduced, must be convinced of his guilt, not upon mere circumstances raising but a suspicion, nor even by a preponderance or greater weight of the evidence, but must be so convinced beyond a reasonable doubt. It is not the proposition of reasonable doubt but the legal presumption of innocence which, at the threshold, attaches to the defendant and attends him throughout the trial until overthrown by proof of his guilt beyond a reasonable doubt; and thus, to warrant a conviction, it is not the proposition of reasonable doubt but the legal presumption of innocence which must be overthrown or removed by evidence. The charge does not convey that meaning. In other portions of the charge, however, such meaning is clearly enough expressed. While, for the reasons stated, I disapprove the charge, yet, when it is considered as it should be, in connection with other portions of the charge bearing on the same subjects—presumptions of innocence, burden of proof, and reasonable doubt—I do not believe it to be of such harmful effect as to require a reversal of the judgment on that ground alone.

But for this, in connection with, and more especially because of, the errors heretofore referred to, I think the judgment should be reversed and a new trial granted. Such is the order.