[Crim. No. 4140. Second Dist., Div. One. Oct. 30, 1947.]

THE PEOPLE, Respondent, v. GEORGE SPARKS, Appellant.

Marshall A. Stutsman for Appellant.

Fred N. Howser, Attorney General, and John F. Hassler, Deputy Attorney General, for Respondent.

WHITE, J.—In an information filed by the District Attorney of Los Angeles County, defendant was accused in three counts of the crime of burglary and in a fourth count with a

violation of the Deadly Weapons Act (Stats. 1923, p. 695, Deering's Gen. Laws, Act 1970, § 1).

Following the entry of not guilty pleas to all counts, the cause proceeded to trial before a jury, resulting in verdicts finding the defendant guilty on each count of the information, and fixing the degree of the three burglaries as of the first degree. From the judgment of conviction defendant prosecutes this appeal.

It is first contended that ''the verdict of the jury and the judgment pronounced thereon is contrary to law and is not supported by the evidence.'' This contention makes it necessary to narrate the facts which gave rise to this prosecution.

As to Count I, H. W. Toone testified that on the night of September 27, 1946, after locking his residence he departed therefrom about 7 p. m. Upon his return around 11 p. m. that night he discovered the back door to his house was open and that a 10-inch gash had been cut in the screen. The house had been thoroughly ransacked, clothing and other articles being disarranged. A desk drawer had been broken open and a .38 Colt revolver, a wallet and several coins were missing. At the trial this witness identified a coin and a .38 Colt revolver as being articles taken from his home, and also identified a holster as being similar to the one taken from his residence.

Concerning Count II, there was testimony by E. C. Wieting, a police officer of the city of San Fernando, that on the evening of October 30, 1946, he departed from his home about 6 :30 p. m., that upon returning thereto about 10 :15 p. m. that night he noticed the rear door was open and the glass portions thereof broken. A writing desk in the living room had been ransacked as had some other drawers and closets. Some money, a ''sap'' or blackjack, a bunch of keys, two gold watches and two small baby rings were missing. At the trial this witness identified a small gold Elgin watch and a blackjack as being articles that were taken from his home. He further testified that the baby rings had been recovered.

With reference to Count III, Dr. James C. Campbell testified that on November 1, 1946, he left his house about 7 p. m. Upon returning about 9 :30 p. m. he discovered that the bathroom window had been broken, that the screen had been taken off, the wire being cut with some sharp instrument and the window opened. Upon entering the house, Dr. Campbell discovered several drawers open and clothing and other contents thereof scattered about. A diamond engagement ring,

a dinner ring and a locket were missing. At the trial this witness identified a locket offered in evidence as the one taken from his home, and testified that one of the rings had been returned to him.

As to Count IV, there was testimony that at the time of his arrest, appellant had in his possession what is commonly known as a blackjack. Testifying in his own behalf appellant admitted possession of the same.

Police Officer Jack L. Richards testified he was one of the arresting officers; that he stopped appellant on the evening of November 6, 1946, at about 7:10 p. m.; that he searched the defendant and found a sap in his pocket and a .38 Colt revolver under his belt; that the gun itself was concealed under the clothing; that the sap and the revolver offered as exhibits were the same articles referred to. That at the time the gun was removed it was fully loaded. That the defendant was then taken to the station and questioned. The witness identified a pocket knife, offered as an exhibit, as being the knife in the possession of the defendant. Richards stated that the defendant was carrying a flashlight and gloves in his pocket. The witness stated that the keys offered as an exhibit for identification were found in a canvas bag belonging to defendant and checked in a locker at a bus depot; that defendant had a key to the locker in his pocket; that on searching the locker the keys were found in the canvas bag. The officer testified that immediately after taking the defendant to the station he had a conversation with him; that there was no force or violence used, no promise of immunity or hope of reward extended, and that the statements were made freely and voluntarily. That defendant was asked how he got the gun and stated that he bought it from a soldier; that he did not know any of the houses, and, with reference to the sap, he did not recall where he got it. That possibly the next day the witness had another conversation with defendant at the police station; that the statements were made freely and voluntarily; that there was no force or violence employed, and no promise of immunity or hope of reward was extended. The witness asked the defendant if he went to the home of Mr. Toone, Dr. Campbell and Mr. Wieting, and the defendant stated that he did go into those three. He said that he could probably point them out; however, that it was dark at the time he saw them and they would not look the same in the daytime. The day after his arrest, defendant was taken in a car to observe the homes. When he saw the Toone home (Count I),

defendant pointed it out and said that he recognized it. He stated, "Yes, I made that place." The defendant stated to Richards that he took out of that home a 4-inch Colt commando, the holster, and the coins. He stated it was the same gun he was carrying at the time he was arrested. When the officers and the defendant passed the Wieting home (Count II), the defendant was asked if he recognized the house and he said he did; that there was a light bulb hanging low on the back porch and that he bumped his head on it as he entered. The officer asked the defendant if he knew it was an officer's home and defendant said he did because of the sap. He stated it was the same sap he was carrying when arrested. When they passed Dr. Campbell's home (Count III) the defendant stated that he "made" that house. As they were going by Dr. Campbell's house the officer asked defendant his method. The latter replied that he used the butt of his flashlight to break the glass, reached in, unlatched the window and went in the house. The officer identified two coins, and stated they were in a sock in a canvas bag in a locker of which the defendant had the key in his pocket at the time of his arrest. That the locker was in the bus depot. The officer stated that the locket (People's Exhibit for identification) was in the defendant's pocket. That two cards, one from the Montague Jewelry Company and the other from the Pacific Jewelry Company were in the pocket of the defendant. The cards were offered for identification. Asked whether he had pawned anything at these addresses the defendant said he had. After the jewelry was recovered, and in the police station, in a conversation at which it was testified no threats, force or violence were used, no promise of immunity or hope of reward was extended, and at which the statements were freely and voluntarily made, the defendant upon being shown the jewelry was asked if he had pawned the same. He stated that he had pawned the articles. The officer testified that the rings were returned to Wieting; that the diamond ring was returned to Dr. Campbell. The officer testified that at the time of the burglary of Dr. Campbell's home he had investigated the same and noticed that the screen had been cut with a clean slash, that the screen had been removed and the glass in the upper part of the window had been broken inwardly. The officer asked the defendant if he had used the knife, offered for identification, to slash the screen. The defendant didn't say anything; "He just grinned."

On the night of the arrest, the officer had two or three conversations with the defendant at the police station, the last one occurring sometime before 11 p. m. In one of the conversations, before the trip in the car, the officer placed the ticket reports of burglaries before the defendant and asked him whether or not he recalled any "jobs." "When he came to the ones that we were just referring to he admitted it." As they drove around in the car, the day after the arrest, defendant identified the houses he had gone into and also a number he would have gone into had there not been a dog or somebody around. With respect to the offenses charged in the information the defendant identified the houses. The gun holster was found in defendant's car; the gun carried by the defendant being unholstered.

The witness Heebing stated he was Chief of Police of San Fernando; that People's Exhibit 11, a card of the Pacific Jewelry Company, was shown to him by an officer and the defendant; that he went to the address given, 552 South Main Street, the day following, because defendant stated he left a ring at that establishment which ring he described as an engagement ring.

On cross-examination Heebing testified that he had a conversation with defendant in his office about an hour after his arrest. The chief questioned the defendant with respect to burglaries, the revolver, and the things he had in his possession. Asked on cross-examination whether he told the defendant it would be better for him to tell about the burglaries, the chief replied he did not. Within the hour's time of the conversation the defendant finally admitted he had gone into two places. Defendant picked out two reports and stated, "Those are the ones I committed." The conversation with the defendant was "just general conversation." All the foregoing exhibits were received in evidence.

Testifying in his own defense, defendant admitted that the officers took the gun and sap from his person. He stated he had "quite a few conversations with the officers at the jail." That there was no force or violence used by Officer Richards. That he talked with Chief Heebing and there was no force or violence used, but that "he did give me to understand that if I told them about it it would save a lot of trouble and probably go easier on me." That the next day Officer Wieting came to the jail and said that "you are the s-o-b and grabbed me by the hair, I guess he was going to try to hit me, or something." Defendant stated that he had the holster in his automobile and

that he had checked a bag in the bus depot. He stated that he sold some old gold in one establishment, and a ring in another. He stated that in the bag he had a bunch of keys, referring to the foregoing People's Exhibit; that he had a flashlight in his bag, as well as a pair of gloves. Further, that he had a locket at the time he was arrested, and that he had the two coins in his possession. Defendant stated that he was carrying the knife, offered as People's Exhibit, at the time of his arrest. That at the time Officer Wieting pulled his hair he had already "confessed to the Chief." That some three or four weeks earlier he had read in the paper where somebody "was pretty badly beaten by the police and he didn't want to take any chances." That no officer ever struck him. That the gun was loaded when it was found on his person.

In rebuttal Chief Heebing testified that he did not directly or in substance state to the defendant that it "would go easier on him" if he admitted the burglaries. That he showed burglary reports to the defendant who looked them over and picked out those that he had committed. That the defendant had studied the reports and stated, "Well, this is one here that I have committed." With respect to the officer's home, when asked if he knew it was such, defendant stated he did; that there was a picture of the officer on the dresser or chest of drawers. With respect to the Toone residence the chief stated defendant said he recalled it because in forcing the drawer of a writing desk he splintered the wood. The chief later spoke with Toone who stated that the drawer had been so damaged.

In support of his first ground for reversal, appellant asserts that "After examining the whole record here we find confessions involuntarily made, without first laying a proper foundation after inducements made by one officer and an assault by another officer upon defendant while in his cell at city jail in San Fernando, and long drawn out conversations by several police officers all night long and into the next day, and rides by defendant and police to many houses which had been burglarized by some person, and a defendant fearful of great bodily harm by reason of another prisoner being beat up by the same police, whom defendant read about just prior to his arrest, and the victim was in the hospital, and the statements made by defendant were made to avoid further danger to himself of such an attack, . . ., which shows the involuntary character of the confessions, and not admissible against him."

After a careful perusal of the record herein we find no

substantiation for the foregoing contentions. It becomes unnecessary to determine whether the statements attributed to appellant were merely admissions or amounted to confessions because, in each instance, the police witness testifying to such statements gave testimony that each conversation with appellant was had freely and voluntarily upon his part, without threat, violence, promise of immunity or other inducement. True, the defendant testified that Officer Wieting, whose house was burglarized, called him a vile name and pulled him by the hair, but appellant also testified that all of the incriminatory statements were made by him on the night preceding his claimed encounter with Officer Wieting. Appellant also testified that Chief of Police Heebing said to him, ". . . if I told him I did those robberies or burglaries it would save them a lot of trouble and probably go easier on me," but the chief testified that he had made no such representations. The only testimony to the effect that his statements were involuntarily made was that given by appellant when he testified that he was apprehensive of bodily injury because, prior to his arrest, he had read a newspaper account of another prisoner having been beaten by members of the police department in whose custody he was. Thus, we have a situation wherein the admissibility of the statements depended upon the credibility of the police officers and the appellant. When the latter testified that his statements were made involuntarily or in response to promises of immunity, his credibility became a matter for determination by the court in the first instance, and then by the jury. It is only when the determination of the triers of fact is so barren of support in the evidence that to adopt it would result in any fundamental unfairness violative of due process that we are warranted in rejecting their determination. In the instant case, in conformity with his duty, the trial judge first determined that the confessions were free and voluntary, made without promise or hope of immunity, and received them in evidence. He thereafter, fully and fairly instructed the jury that they were entitled, under the same. evidence, to determine that the confessions were not so made and to refuse to consider them.

■ Assuming, but not deciding the correctness of appellant's contention that all of his statements to the police amounted to confessions, the record, as heretofore pointed out, discloses that before any conversations between the People's witnesses and appellant were related on the witness stand, there was a sufficient preliminary showing made or foundation

laid that such statements were freely and voluntarily made, without any offers of immunity, leniency, threats or inducements. The proper foundation having been laid, the confessions were admissible, subject to the right of appellant to challenge the admissibility thereof by proof that the same were not freely and voluntarily made or were made because of offers of immunity or hope of reward. When, as here, the evidence is conflicting, the decision of the triers of fact is subject to the universal rule applicable to cases on appeal, that the reviewing court will uphold the decision if there is substantial evidence to support it. While the evidence on the question of the admissibility of appellant's statements is conflicting, there was substantial testimony to support the conclusion that no inducements were held out to appellant to elicit the statements he made, and that such statements were voluntary. Hence, we cannot say that in resolving the conflict thereon against appellant the triers of fact committed reversible error. The jury was clearly instructed that the ultimate question whether the statements were confessions or admissions, and if the former, whether they were given freely, voluntarily and without promise of immunity or hope of reward, was for the jury to decide and in any event, as hereinbefore stated, whether the statements were admissions only, or constituted confessions, the proper foundation was laid for their reception as confessions. Hence, no prejudice to appellant resulted.

In support of his claim that the record shows ''confessions against defendant, constant pressure and long drawn-out fruitless attempts . . . to get confession and constant denials of defendant showing involuntary character,'' and ''inducement of the Chief of Police,'' appellant refers us to certain portions of the reporter's transcript. We refrain from here setting forth in detail the testimony just referred to because, for the' most part, it is hereinbefore set forth and discussed, and furthermore, the testimony in question does not support appellant in his contention last above set forth. In his brief appellant fails to point out wherein the testimony in question supports his assertions with reference to it.

Appellant next claims that the court erred in denying his motion that the jury be advised that the court deemed the evidence insufficient to warrant a conviction and that the jury should acquit him (Pen. Code, § 1118). It is here urged that the motion should have been granted for the reason that (a)

the corpus delicti was not established by evidence other than the extrajudicial statements of appellant, and (b) that the confessions, having been improperly obtained, were not admissible in evidence.

As to the first of these claims it may be said that the corpus delicti in Counts I, II and III was amply proven by the three householders who testified to the essentials of burglary, and Count IV presents no problem, because not only was there testimony by the arresting officers that at the time of his arrest appellant was armed with a blackjack, but appellant at the trial, when testifying, admitted such possession.

It is not necessary that the corpus delicti be proved by direct, positive evidence. It may be proved by circumstantial evidence and reasonable inferences drawn therefrom. When prima facie evidence was presented that the homes in question were entered with the intent and purpose of committing larceny, the evidence in support of the corpus delicti was sufficient. The connection of appellant with the crimes charged against him is not part of the corpus delicti (*People v. Carter*, 10 Cal.App.2d 387, 388 [52 P.2d 294]). In the instant case, it is obvious, from the foregoing summary of the evidence, that the facts forming the basis of the several counts charged against appellant were proven, together with the existence of a criminal agency. Having held that the admissions, or if considered as confessions as urged by appellant, were legally receivable in evidence, they could properly be considered for the distinct purpose of showing that appellant was a participant in the crimes charged against him. The motion for an advisory verdict was, therefore, properly denied.

The next point urged for a reversal is that ''The court erred by permitting the District Attorney to use extrinsic evidence not in the record as argument to the jury.'' In this respect it appears that the district attorney in his argument to the jury said:

''Now, certainly, I do not see how anybody could condemn the police department for questioning at some considerable length when they find the defendant at the time he is arrested has in his possession this knife, and this knife, I think, is of some interest, because you can see, in the light, that there are a number of what appears to be scratches on it, and you know that in all of these burglaries the screens were out——''

Whereupon appellant's counsel stated:

"I move that the Court instruct the jury to disregard that. There is no evidence in the record that I know about him cutting the screens with that knife."

The knife itself was admitted in evidence. There were scratches on the blade of the knife. Appellant admitted possession of the knife, and there was testimony that screens on the houses burglarized had been cut with a sharp instrument. When one of the police officers inquired of appellant whether he had used the knife to cut the screens on the houses he said nothing. According to the officer, ". . . he just grinned."

In an argument before the jury counsel may draw any reasonable inferences from the evidence and give to the jury his version of what is shown by the evidence, and also point out such conclusions as may be fairly drawn therefrom. Under the foregoing testimony, it must be held that the argument of the district attorney did not amount to prejudicial misconduct so far as the defendant's rights are concerned. (*People* v. *Eggers*, 30 Cal.2d 676, 692 [185 P.2d 1].)

Finally, appellant challenges the correctness of certain instructions. He asserts that the court's instructions defining admissions and confessions are erroneous, but gives us no reason to support such claim. We find such instructions to be correct statements of the law. Neither are we cited to any cases nor are we presented with any argument in support of appellant's claim that the court's instructions on the admissibility of confessions were erroneous. We find support for such instructions in numerous cases.

 Error is next predicated on the claim that the court failed to instruct the jury that the extrajudicial statements of appellant were not to be considered until the corpus delicti was proved beyond a reasonable doubt. As heretofore pointed out, proof beyond a reasonable doubt of the corpus delicti is not required as a prerequisite to the admission of a confession. A prima facie showing is sufficient.

Appellant argues that certain of the statements were confessions and not admissions. As heretofore indicated, this question becomes unimportant because whether admissions or confessions, a proper foundation was laid for the introduction of all appellant's statements as though they were confessions. In view of the verdicts rendered, it must be held on appeal that the jury determined that all of appellant's statements were freely and voluntarily given, and were not made in response to any offer of immunity or hope of reward.

With reference to appellant's contention that the instructions given as to the presumption of innocence, degrees of burglary, possession of stolen property and possession of a blackjack are erroneous, suffice it to say that no authorities are cited supporting his contentions, while many cases sustain the correctness of the instructions given.

▉ Appellant's claim that prejudicial error ensued from the failure of the court to give five instructions proffered by him is without merit. These instructions referred to the exclusive prerogative of the jury to determine the weight of evidence and the credibility of witnesses; the doctrine of reasonable doubt and the presumption of innocence; the admissibility of confessions and the possession of property taken by means of burglary, soon after the commission of such burglary. These subjects and principles of law were fully, correctly and fairly stated in other instructions given by the court.

Upon this review of all the points urged by appellant, we discover no error in the record, and the judgments appealed from are, and each of them is, therefore, affirmed.

York, P. J., and Doran, J., concurred.