[Crim. No. 789.   Fourth Dist.   Jan. 6, 1954.]

THE PEOPLE, Respondent, v. ARTHUR D. KINDER, Appellant.

458

Clifford L. Duke, Jr., for Appellant.

Edmund G. Brown, Attorney General, and Norman H. Sokolow, Deputy Attorney General, for Respondent.

GRIFFIN, J.—A jury convicted defendant of the crime of burglary (second degree) under Penal Code, section 459, in count one of an information charging that on November 14, 1952, he entered the home of Edward N. Petrick with the intent to commit rape. In count two he was charged and convicted of the crime of illegally administering an anaesthetic, under section 222 of the Penal Code, in that he administered ether to Petrick and his wife Gladys with the intent to enable himself to commit rape upon the wife. Judgment was pronounced and defendant was ordered committed to a state prison, the sentences on each count to run concurrently. Defendant's application for examination as a sexual psychopath was granted and sentence was suspended pending such examination. This appeal followed.

It is defendant's first claim that independent of his claimed admissions or confessions, no corpus delicti of either offense was established by the evidence, and that therefore any evidence of his claimed admissions or confessions was erroneous, citing such cases as *People* v. *Fleming,* 94 Cal. 308 [29 P. 647] ; *People* v. *Simonsen,* 107 Cal. 345 [40 P. 440] ; and *People* v. *Mize,* 80 Cal. 41 [22 P. 80].

Viewed from the aspect most favorable to the People, as we must (*People* v. *Renek,* 105 Cal.App.2d 277, 281 [233 P.2d 43] ) the salient facts are that on November 14th, Petrick, with his wife and family, were living on Saipan Street, in Oceanside, in a two-bedroom apartment. About 4 :15 a. m. that day Petrick was awakened by feeling someone pushing against his right side. He thought it was their son wanting to come into bed with him and his wife. The defendant jumped out of their bed and was nude excepting for a pair of socks he had on. After ordering Petrick to turn off the light he had just turned on, defendant went to the far side of the bed and stooped down as if picking up something from the floor. Defendant insisted he could explain everything and offered a story about being out with some girls that evening and thought he had found their apartment. He appeared to Petrick to be sober and knew what he was doing. Defendant grabbed his clothes and left through the door which Petrick said had been left closed and thought to have been locked. Petrick chased defendant through the housing quarters and his wife left for the neighbors. The police were notified. After a chase the police found defendant partially dressed and returned him to the Petrick home. As they reentered they smelled a "terrible odor" like ether emanating from the

pillow and sheet upon which Mrs. Petrick's head had been resting, and on which was noted some wet substance. The sheets on the wife's side of the bed contained this wet substance and were discolored with mud at the foot of the bed (apparently from mud on defendant's socks).

It also appears from the evidence produced by the People that a Mr. Wagner and his wife were living in an apartment near by. Between 4 o'clock and 4:15 that morning Mrs. Wagner was awakened from her sleep by something cool being dripped on her face. She looked up, saw a man resembling defendant, screamed, and Mr. Wagner awakened and told the man to get out. That man was asking if "Dorothy lived here." He then turned and ran down the stairs. He was partially dressed and in his stocking feet. Wagner thought the intruder had a shiny object like a metal container in his left hand at the time. He noticed an odd smell in the bedroom like "rubbing alcohol." It was later discovered that in the kitchen several cupboard doors and a drawer had been left open but nothing was missing.

A Mr. Fortune and his wife lived near by and about 4:15 that morning Mrs. Fortune was awakened by some man in their apartment calling "Betty" near their bedroom door. Mr. Fortune told him he was in the wrong house and the man left. They later observed muddy stocking footprints from the front door to the bedroom door and also smelled a peculiar odor like a "hospital smell." They believed their door had been locked before they retired. At the trial it was stipulated that the person entering their apartment was "probably the defendant." Mr. Fortune said the intruder's voice was clear and his speech coherent.

A police officer entered the Wagner home and smelled the strong odor which he believed was ether or chloroform. In front of this address was a Buick automobile. Under it was found a can and a Marine Corps man's shoe. It was near here that the defendant was accosted by the officers, wearing only one such shoe. The officers detected on the person of defendant a similar odor to that of the contents of the can. They asked him where he was going and he said he was returning to the Marine Base and wanted to know why they were stopping him. Defendant repaired to the back seat of the officers' car and seemed exhausted from running. To the officers he appeared to be sober and mentally normal. The can which was found by the officers was taken to be analyzed and its contents were found to contain ether. There was a slit

made in the top of the can by some instrument. At the trial the stains on the sheet and pillow from the Petricks' residence were identified as having possibly been made by ether.

After defendant's arrest a signed statement was made by him consisting of questions and answers, the gist of which was that in the early morning hours of November 14th, defendant went to his locker room at Camp Pendleton and took from it a can containing ether, which he had previously taken from sick bay; that he had previously been out with two girls (Fran and Dorothy) and two of his buddies; that after leaving the buddies at the base he "cashed himself away" in the trunk of the car and was driven back to Oceanside unbeknown to the girls; that he got out of the trunk of the car after the girls had gone in their home; that he knocked at a residence which he believed was their home but no one came to the door; that he tried several doors of different homes and entered some of the places; that in one home he opened the can of ether with a table knife and shook some of the contents on the bed where two persons were lying; that he turned and left when the man asked him what it was that he had spilled on him; that he entered another place and that the door was unlocked; that he removed all of his clothing except his socks and sprinkled some ether on the pillow and got in bed and discovered that a woman was asleep on the pillow next to him; that he knew there were two persons in the bed and that it was his intention to sprinkle the ether to put the persons to sleep and to criminally assault the woman; that he put his arm around her, although he did not touch her bare flesh, and after being there about a minute he discovered he did not like the ether smell so he got out of that side of the bed and got on the other side of it and discovered a man was beside him; that he heard some talking between the man and woman and asked the man where he could find the bathroom and told him not to turn on the light; that he went over and picked up the ether can and his clothing and left; that while running he fell down, lost his shoe, and threw the ether can under the car; and that while carrying the open can from one house to another he spilled some in his trousers pocket. When questioned later about his reasons for entering these homes the officer asked him if one reason might have been to commit murder and defendant answered "No." He was then asked if he intended to have sexual intercourse with the lady after he removed his clothes and he answered: "That sounds the most logical"; that "I guess what I intended

actually to do was to have sexual intercourse, everything was hazy and dim, but that is the only clear thing that can be a motive.'' However, defendant stated just before signing this statement that he was looking for the two girls that were in the car and he ''was after them.''

At the time of trial defendant testified to about the same story. He said that he had the ether in his locker because at one time a medical corps man had given him a whiff of ether and it had an exhilarating effect; that he did not have any thought, notion or intention of raping anybody when he went into Petrick's home; that he had no idea why he took off his clothes and got in their bed unless it was because he was tired and wanted to go to bed; that when he fell down and dropped the ether can he inhaled the vapors from it because he felt it would have the same effect as whiskey; that by what he said in his written statement he did not mean to convey the idea that when he went into the Petrick house he intended to have sexual intercourse with Mrs. Petrick nor did he intend to put people to sleep with the ether; that he was not sure that he had the can of ether in the Petrick home, but he remembered having it with him through most of the night and guessed he did have it in there; and that he was sure he never did ''anything like this'' before. Defendant was then asked if he did not remember crawling in bed with a Mrs. Gallegos while she and her husband were sleeping in a tent on the beach in Oceanside about August 17, 1952. He replied he did not remember any such incident and denied knowing the parties. After defendant so testified the prosecution produced Mr. and Mrs. Gallegos, who testified they were awakened by someone intending to have intercourse with Mrs. Gallegos under a somewhat similar method of approach as related by defendant in the Petrick case, excepting no ether was present. On that occasion the husband was awakened by his wife's screams. He jumped out of bed and knocked the defendant down and the military police were called and took the defendant away. Gallegos testified the defendant appeared to be sober on that occasion.

Defendant then took the stand and admitted the occurrence but contended that he just went into the tent and that some woman then screamed and the man hit him, and after that he ''was just trying to find out what everything was about.'' He then assigned the reason for his first telling the jury it did not occur and that he never saw the Gallegoses before as being that his attorney advised him this other claimed of-

fense could not properly be placed before the jury because evidence of it was inadmissible, since the trial court, in a previous trial, so held when such evidence was offered as part of the People's evidence in chief. Counsel for defendant indicated to the court that he did so inform the defendant and now claims that he was led to believe by the district attorney that such evidence would not again be offered at defendant's second trial; that therefore it was prejudicial error to cross-examine the defendant on this subject.

Defendant produced a marine who testified he was with defendant on the night of November 13th when they drank liquor in several bars in Oceanside. He testified that when they returned to barracks defendant was either "playing possum that he was drunk or he was drunk"; that he did not know defendant had a can of ether and never spoke to the defendant about "whiffing ether to get high."

█ To authorize the reception into evidence of the defendant's confessions or admissions a prima facie showing of the corpus delicti is sufficient. This showing may consist of circumstantial as well as direct evidence and the reasonable inferences to be drawn therefrom. █ The corpus delicti need not be established beyond a reasonable doubt or even by a preponderance of the evidence for the purpose of receiving confessions or admissions. (*People* v. *Gouldy,* 69 Cal.App.2d 6, 10 [158 P.2d 59]; *People* v. *Sparks,* 82 Cal.App.2d 145, 155 [185 P.2d 652]; *People* v. *Kelly,* 70 Cal.App. 519, 523 [234 P. 110].) █ The evidence produced, together with the reasonable inferences that may be drawn therefrom, were sufficient to establish the corpus delicti for the purpose of admitting the claimed confession or admissions of the defendant in evidence. (*People* v. *Kittrelle,* 102 Cal.App.2d 149 [227 P.2d 38]; *People* v. *Nye,* 38 Cal.2d 34, 36 [237 P.2d 1]; *People* v. *Cline,* 138 Cal.App. 184, 194 [31 P.2d 1095].)

█ Defendant next complains because the court allowed the deputy district attorney to read into evidence in the instant case a remark made by defendant's counsel in his opening statement to the jury at the former trial, wherein he stated that defendant vaguely remembered the can of ether sitting on the floor of the Petrick home and picked it up and started out with it. In his opening statement in the instant trial he indicated that the evidence would show defendant did not take the can of ether into the house. The mere argument of counsel is not evidence and is not admissible as

such unless made as a factual admission formally made and entered in the course of a trial. (*People* v. *Hogel,* 73 Cal. App. 216 [238 P. 815].)

█ The error in admitting the argument and statement of counsel as to what defendant expected to prove was not prejudicial because the evidence and the statement of the defendant indicate that he did have the can of ether with him on that occasion.

The next contention is that defendant was wrongfully compelled to testify against himself when asked on cross-examination about the Gallegos event occurring on August 17, 1952, and it is further argued that the evidence of the other offense was inadmissible, citing article 1, section 13, California Constitution, and such cases as *People* v. *Arrighini,* 122 Cal. 121 [54 P. 591]; *People* v. *Huston,* 45 Cal.App.2d 596 [114 P.2d 607]; *People* v. *Asavis,* 22 Cal.App.2d 492 [71 P.2d 307]; *People* v. *Schmitz,* 7 Cal.App. 330 [94 P. 407, 419, 15 L.R.A. N.S. 717]; and *People* v. *McCarthy,* 88 Cal.App.2d 883 [200 P.2d 69].

█ Since defendant was asked, on direct examination by his own counsel about what defendant's intentions were when he made the advances toward Mrs. Petrick, as indicated, and since he denied any intent to commit an act of sexual intercourse with her, the question elicited on cross-examination was proper and the evidence produced was clearly admissible under the rule established in *People* v. *Peete,* 28 Cal.2d 306 [169 P.2d 924]; *People* v. *Kynette,* 15 Cal.2d 731 [104 P.2d 794]; *People* v. *Coltrin,* 5 Cal.2d 649 [55 P.2d 1161]; and *People* v. *Harrison,* 46 Cal.App.2d 779 [117 P.2d 19], to the effect that on rebuttal of the defendant's testimony, when he has testified as to his innocent intent, evidence of similar offenses is admissible to rebut his testimony as to his claimed intent where the prior acts attempted to be established show an intent by the defendant to commit the same offense with which he stands charged.

In *People* v. *Zabel,* 95 Cal.App.2d 486 [213 P.2d 60], it was held that rebuttal evidence is properly received under the rule that evidence of similar crimes may be admitted to prove intent where, as in the case at bar, intent is an issue and criminal intent is denied by the defendant. See, also, *People* v. *Zatzke,* 33 Cal.2d 480 [202 P.2d 1009]; and *People* v. *Nye,* 38 Cal.2d 34 [237 P.2d 1]. No prejudicial error is shown in allowing the prosecution to cross-examine the de-

fendant in reference to the Gallegos affair under the circumstances related.

Next, it is argued that the deputy district attorney was guilty of prejudicial misconduct in suggesting several reasons why defendant left Mrs. Petrick's side of the bed and moved over with Mr. Petrick on the night indicated. The reasons advanced were merely conjectures on the part of the prosecutor. The ultimate question presented was left to the jury. The reason advanced may have been faulty and the deduction from the premises illogical, but this was a matter for the jury ultimately to determine, and not a subject for exception on the part of opposing counsel. (*People* v. *Willard*, 150 Cal. 543, 552 [89 P. 124] ; *People* v. *Carter*, 116 Cal.App.2d 533 [253 P.2d 1016].)

Lastly, defendant contends that the trial judge committed prejudicial error during the *voir dire* examination of the jurors when he interrupted counsel for defendant and remarked that he did not believe it was the law that every element of the crime, such as *specific intent*, had to be proved beyond a reasonable doubt. No objection was made to the remark and no request was made to strike it. Later, the court did properly instruct the jury that as to *specific intent*, the jurors must be convinced beyond a reasonable doubt as to that element before it can return a verdict of guilty.

It will be presumed that the jurors followed the instructions as given to them by the judge in his formal charge, and not what he may have believed the law to be in a discussion with counsel during a general questioning of the panel as to their qualifications or for cause. (*People* v. *Grimes*, 113 Cal.App.2d 365, 371 [248 P.2d 130].) No prejudicial error resulted. (Cal. Const., art. VI, § 4½.) In the absence of timely objection to the remark or a request for a proper admonition to the veniremen, defendant may not now be heard to complain. (*People* v. *Guasti*, 110 Cal.App.2d 456 [243 P.2d 59].)

It is charged in the amended information that the defendant was previously convicted in the State of Washington of the crime of second degree burglary, a felony. Defendant denied this prior charge. The record does not indicate what disposition, if any, was made of it. Since no point is made of that fact, we will not consider it.

Judgment and order affirmed.

Barnard, P. J., and Mussell, J., concurred.