STATE of Utah, Plaintiff and Appellee,

v.

Scott G. WORTHEN, Defendant
and Appellant.

No. 20328.

Supreme Court of Utah.

Aug. 23, 1988.

**840**

David L. Wilkinson, Sandra L. Sjogren, Salt Lake City, for plaintiff and appellee.

D. Gilbert Athay, Salt Lake City, for defendant and appellant.

STEWART, Justice:

Scott G. Worthen was convicted by a jury of second degree murder for the death of his stepdaughter, three-year-old Heidi Pavich. On appeal, he asserts that the trial court erred in (1) unduly limiting the scope of voir dire examination; (2) not allowing him to call the prosecutor as a witness or to introduce into evidence a letter written by the prosecutor; (3) denying him due process of law because the prosecutor failed to disclose material exculpatory evidence; and (4) denying his motion for a new trial. He also asserts that the evidence was insufficient as a matter of law to support a finding of "depraved indifference" under the second degree murder statute.

## I. THE FACTS

Kathleen and Mike Pavich were married in 1977 and had two daughters, Jodi and Heidi. Heidi was the younger daughter. When the Paviches divorced, Kathleen was awarded custody of the two children.

The defendant, Scott Worthen, met Kathleen in September, 1981. In December, 1981, he began living with her, and in September, 1982, they were married. During the month of April, 1982, six months before her death, when Heidi was twenty-six to twenty-eight months old, she began to suffer multiple bruises and injuries, and several different physicians treated her for those injuries. Frequently, Kathleen and Scott's explanation for Heidi's injuries was that she had fallen down stairs or out of bed. For example, in June, 1982, the explanation was that Heidi had an inner ear problem that caused her to lose her balance. Heidi's personality also changed during the last two to three months of her life. She no longer liked to feed herself and regressed from being toilet trained to incontinence. Her moods were very erratic. Sometimes she was playful like a normal

child, but at other times she would lie down and stare, as if she were afraid to go to sleep.

On the weekend before Heidi's death, Mike Pavich picked up the girls for a weekend visitation. On Saturday and Sunday Heidi acted normally. On Monday morning, Heidi did not eat her cereal, but drank the milk from her cereal. (We refer to the times she ate on this day because of their relevance in light of the expert testimony in determining when the fatal injury was sustained.) When she arrived at the day-care center, she asked for a drink. Two day-care center employees testified that they did not see anything unusual about Heidi that day. She ate her lunch and seemed all right when she left at 3:30 p.m. While at home that afternoon, in Kathleen's custody, Heidi asked for and ate part of a cookie and went outside to play with her mother and sister. At 5:15 p.m., when the defendant arrived home, Heidi was fine, and Kathleen left the house to go to a spa. Heidi refused to eat after her mother returned home around 7:30 p.m.

Scott Worthen testified concerning his version of the events which occurred the evening of Heidi's death. Shortly after Kathleen left, Scott served Heidi a bowl of stew, but Heidi did not eat it. When Heidi informed Scott that she needed to go to the bathroom, he took her into the bathroom and told her to get on the toilet. She wandered out of the bathroom and into her bedroom, where defendant found her and picked her up. She then had a bowel movement that soiled his leg; she also began to look pale and vomited. Defendant left Heidi in the bathroom for the next forty-five minutes while he and Jodi ate dinner and worked on projects. Kathleen phoned ten or twelve minutes after she left for the spa, and Scott told her that he was trying to feed the girls and that Heidi had soiled his leg. Kathleen asked Scott if she should come home, and he replied that she should go to the spa and that he and Jodi would clean up.

Heidi looked ill when Scott retrieved her from the bathroom. He prepared her for bed and laid her down on the bed with towels to protect the bedding. He then stepped out on the porch to get some fresh air. Heidi threw up in her bed, rolled over in the vomit, and got it in her hair. The defendant tried to rinse the vomit off Heidi in the shower, but she resisted being held under the spray. While she was fighting, Scott pulled her into the spray, and because there was not enough water pressure to remove the vomit from Heidi's hair, Scott held her close to the shower head. Heidi's continued fighting caused her to slip out of his hands. When the defendant grabbed her, they both fell backwards, and he hit his head and she landed on his chest. After the shower, Worthen put her back in bed, but she vomited again prior to Kathleen's return. Worthen returned to her bedroom and found Heidi trying to crawl under her bed. She had spit up a little, and defendant cleaned her up.

When Kathleen returned from the spa, both Heidi and Scott were wet from the shower and Jodi and Scott were dressing Heidi. At that time, Scott informed Kathleen that Heidi would probably have red marks on her chest because he and Heidi had slipped in the shower and he had grabbed her really hard and "dug her." Kathleen then took over, and Scott and Jodi left for about forty-five minutes. Heidi told her mother that her "tummy" hurt and continued wretching. Although Kathleen gave Heidi coke syrup, her stomach did not settle down, and she continued wretching at approximately twenty to thirty-minute intervals for an uncertain period of time. Finally, Heidi fell asleep.

At about 3:30 a.m., Scott Worthen responded to Heidi's screams. He found her in the kitchen beside some spilled milk and told her to go back to bed while he cleaned up the milk. Before he went back to bed, he checked on Heidi. Finding that she was "ice cold," he prepared a bath for her. While Heidi was bathing, her tongue moved slowly in and out of her mouth, and her eyes rolled to one side of her head. Kathleen came to help, and Heidi became alert again. Worthen commented that he thought Heidi had the flu, which she had been experiencing on and off for the previous two weeks, and then he went back to

bed, leaving Heidi with Kathleen, who put her back to bed.

Worthen awoke again at 5:00 a.m. Before dressing for work, he went into Heidi's room. Heidi was facing the window, and he was immediately aware that she was not breathing. He attempted to resuscitate her while Kathleen phoned for help. Paramedics and police officers soon arrived and were unable to revive Heidi.

Roger Anderson, a deputy county sheriff, made a routine examination of Heidi's body. He testified that both rigor mortis and liver mortis were present in the body, although neither process was completed. Her body was covered with many bruises, her abdomen was distended and rigid, and there were about seventeen small abrasions on her chest. Dr. Monique Ryser, State Medical Examiner, conducted an autopsy and determined the cause of death to be multiple blunt injuries which resulted in a completely transected duodenum, causing severe peritonitis. The duodenum is behind the stomach and directly in front of the vertebral column. Dr. Ryser was uncertain whether the blow that had caused the injury had come from the front or the back. However, she testified:

> To tear the organ the way the organ is torn [requires that the organ be] compressed against the backbone by a blow that comes either from the front to back, or back to front, and presses all the tissue together, so that the two structures are cut or torn over the sharp bone that is your vertebral spine.
>
> The blow comes—well, whichever direction the blow comes from, what happens is all the tissue from the skin, the front of the belly, are literally pushed back so they almost come in contact with your backbone. What is in between is crushed or torn.

In her initial testimony, Dr. Ryser testified that the blunt force which caused the injury could be inflicted by a fist, a foot, a hand, a knee, an elbow, or some type of instrument, such as a piece of wood. On cross-examination, she stated that the injury could also have resulted from the child's being pushed into an object by a sibling.

On rebuttal, she emphasized the severity of force necessary to inflict the injury, asserting that a fall from two stories onto a protruding blunt object would cause the same injury and stated she would expect to see an injury similar to Heidi's in an adult who was in an automobile collision if the car was traveling over fifty miles per hour.

Dr. Ryser testified that the injury which caused Heidi's transected duodenum occurred at most twenty-four to forty-eight hours prior to Heidi's death, but that the probable time of the injury was twelve hours or less before death. Dr. Ryser also stated that Heidi's injury was an unusual injury which she had never seen before. She indicated that a child who had a transected duodenum would not want to eat, but that if she did eat, she would vomit. She also stated that Heidi's death was a homicide.

In addition, Dr. Ryser testified that Heidi had suffered many other bruises and injuries that were in various states of healing. There were bruises near her eye, on her chin, just below her right nipple, on the left side of her chest, above and below her navel, above her left hip, on and above her left knee, on the inner portion of the back of her knee, on her right forearm, on the back of her left thigh and on her back and scapular area. An internal examination of Heidi's scalp revealed two bruises on the midline of her head, four overlapping bruises on her forehead, and five overlapping bruises in front of and above her ear. Heidi also had a fractured rib which was healing and was several weeks old. Based on the injuries that she found, Dr. Ryser concluded that Heidi was a battered child.

Dr. William Palmer, a pediatrician on the Primary Children's Medical Center child protection team, testified that the pain from a transected duodenum is one of the most severe kinds of pain that a person can suffer. The fat and protein-digesting enzymes from the duodenum eat away other internal organs. He stated that a child with a transected duodenum would not want to eat.

On the basis of Heidi's medical history, he also concluded that she was a battered

child. Dr. Palmer testified that from the time Heidi was twenty-six to twenty-eight months old until her death, she suffered a series of injuries and bruises. He stated that the number and severity of these injuries was not realistically explained by falls down stairs, out of bed, or into a barrier. The onset of Heidi's injuries, occurring after she had learned to walk, the absence of any medical evidence of a bleeding disorder, and the locations on her body of the injuries were factors which led to his conclusion. One episode of injuries might have been explained by the effect that an ear infection could have had on Heidi's equilibrium during June of 1982, but the bruising was more pronounced than could have been caused by falling down stairs, the explanation given in the medical record. The bruising on Heidi's chest was unusual for a child her age, as were the bruises on her back and behind her knee.

According to Dr. Palmer, the severity, location, age, and unknown origin of Heidi's bruises supported the conclusion that Heidi was a battered child. His opinion that Heidi was a battered child was also based on the fact that Heidi's various injuries and bruises had been treated by different physicians, a pattern common to battered children. Finally, he noted that one of the social characteristics of battered child syndrome is that the family of the battered child suffers stress, caused by an event such as divorce or the custodial natural parent's involvement with another person who has no emotional involvement with the child.

Dr. Serge Moore, dissatisfied with Dr. Ryser's microscopic studies, took new tissue samples from the examiner's office and made new slides. His analysis indicated several stages of injury to the duodenum, some occurring at least seventy-two hours prior to Heidi's death. Dr. Ryser examined these new slides but disagreed with Dr. Moore's conclusions and maintained that the injury causing Heidi's death occurred within twelve hours of her death, although the injury could have been caused by more than one blow. Dr. Moore asserted that Dr. Ryser's disagreement was due to "a matter of interpretation." Dr. Moore also disagreed that a three-year-old would necessarily feel pain from a transected duodenum. He stated that the child would probably go into shock. However, he thought that a three-year-old in shock would be noticed by and cause concern to a normal adult. He further testified that it was highly unlikely that Heidi's duodenum had been completely transected before Monday night. He agreed with the other two experts that a child with a transected duodenum would not want to eat.

This appeal is from a conviction rendered in the second trial of the case. At the conclusion of the first trial, the trial judge set aside the verdict and ordered a new trial because he concluded that he had erroneously admitted battered child syndrome evidence. While the State's appeal was pending, this Court held that evidence of battered child syndrome is admissible to prove that a child's death is not accidental, if a proper foundation is laid. *State v. Tanner*, 675 P.2d 539, 543 (Utah 1983).

Prior to the scheduled trial date, the prosecutor sent a letter to the trial judge, with a copy to the defendant, which addressed the admissibility of battered child syndrome evidence in Worthen's retrial. In part, that letter stated:

> The evidence I would like to proffer to the court is evidence of abuse to the victim, Heidi Pavich. *The court should be made aware that we have no evidence to support who in fact inflicted the physical abuse. The only evidence the State can offer is that there was no abuse prior to the time Scott Worthen moved into the home, and that after Scott Worthen moved into the home there was substantial abuse.*

(Emphasis added.) The letter then listed a number of documented incidents of injuries to Heidi Pavich which the prosecutor asserted constituted the evidence of battered child syndrome and then stated:

> *Again, I would like to point out that we have no direct or circumstantial evidence indicating that Scott Worthen committed any of the above acts.* Our position is simply that the injuries consti-

tute the battered child syndrome, and based on the *Tanner* case, the injuries are admissible.

(Emphasis added.)

The day before trial, the defendant moved for permission to call the prosecutor as a witness to testify that none of the prospective witnesses interviewed had seen Scott Worthen commit any act of abuse. The defendant also moved, in the alternative, to submit the sections of the letter quoted above to the jury as representative admissions of a party opponent to show that the State knew that there was no evidence that Scott Worthen committed any act of abuse. The judge refused to allow the defendant to call the prosecutor or to submit the prosecutor's letter to the jury because the judge was not convinced that the evidence was important enough to the defendant's case to warrant requiring the prosecutor to testify. After trial, defendant's attorney received a phone call from a Kaysville woman who had read an account of Dr. Ryser's testimony in a local newspaper. She informed the defendant's attorney that twenty-five years previously she had suffered a perforated duodenum in an auto accident at a speed of ten miles per hour or less. The trial judge refused to grant a new trial on the ground of newly discovered evidence.

## II.  JURY VOIR DIRE

The defendant contends that prior to voir dire, the prosecutor and the defense attorney held an off-the-record discussion with the trial judge concerning the scope of permissible voir dire questions and that the defendant gave the judge two worksheets containing voir dire questions. The defendant further contends that the judge stated that voir dire would be limited to the following questions: (1) whether there was a stepparent and/or stepchild relationship in the juror's family unit, and if so, whether the juror had formed an opinion concerning step-relationships; (2) whether the panel member had any dealings or connection with the Division of Family Services and, if so, the nature of that relationship and the feelings generated thereby; and (3) wheth-

er pretrial publicity had any effect on the juror.

The panel as a whole was asked several general questions. However, when it became apparent that several panel members had been exposed to press coverage of the case, the judge and counsel questioned each panel member in chambers concerning his or her awareness of the pretrial publicity. Generally, when a panel member's responses were negative, defense counsel limited his voir dire questions to those topics set out above. However, when a panel member responded affirmatively to the questions about pretrial publicity, counsel was allowed to ask additional related questions. Although the questioning was not extensive, the judge did not prevent defense counsel from asking any specific questions. At the end of each series of questions by defense counsel, the trial judge asked if the defendant had further questions, and he replied that he did not.

After the voir dire was concluded, defense counsel alluded to the pretrial voir dire conference and stated:

[W]e had prepared, Mr. Sullivan and myself, a number of proposed voir dire questions.... We would like to, at the conclusion of the voir dire, offer [our] worksheets ... which we intended to work from and ask questions. We feel that the Court has at least initially limited us in reference to the voir dire questions that we can ask of the jury, which we deem to be appropriate and pertinent to the charges against Mr. Worthen.

The prosecutor had no objection, and the worksheets were made a part of the record.

The importance of enabling trial counsel to exercise peremptory challenges intelligently based on information gleaned from voir dire has long been recognized. *See generally United States v. Christensen*, 7 Utah 26, 31, 24 P. 618, 620 (1890). In *State v. Taylor*, 664 P.2d 439, 447 (Utah 1983), this Court stated that "voir dire examination has as its proper purposes both the detection of actual bias ... and the collection of data to permit informed exercise of the peremptory challenge." (Citations omitted.) And in *State v. Ball*, 685 P.2d

1055 (Utah 1984), we reversed a criminal conviction because the trial court improperly limited jury voir dire and thereby denied the defendant the important right of exposing latent jury biases. *Id.* at 1056.

■■■ Although a trial judge has some discretion in limiting voir dire examinations, *State v. Bishop*, 753 P.2d 439, 448 (Utah 1988), that discretion should be liberally exercised in favor of allowing counsel to elicit information from prospective jurors. *See State v. Ball*, 685 P.2d at 1060. *See also United States v. Ible*, 630 F.2d 389, 394–95 (5th Cir.1980). Indeed, the fairness of a trial may depend on the right of counsel to ask voir dire questions designed to discover attitudes and biases, both conscious and subconscious, even though they "would not have supported a challenge for cause." *State v. Ball*, 685 P.2d at 1060. All that is necessary for a voir dire question to be appropriate is that it allow "defense counsel to exercise his peremptory challenges more intelligently." *Id.* Peremptory challenges are designed to allow an attorney an opportunity to remove a juror, not because he or she is prejudiced as to the particular facts of the case, but for more general biases that affect how a juror may perceive and evaluate witnesses, parties, and evidence. Juror attitudes revealed during voir dire may indicate dimly perceived, yet deeply rooted, psychological biases or prejudices that may not rise to the level of a for-cause challenge but nevertheless support a peremptory challenge. Thus, trial counsel should be given considerable latitude in asking voir dire questions, especially in view of the fact that only counsel will, at the beginning, have a clear overview of the entire case and the type of evidence likely to be adduced. Voir dire should not be restricted to a "stark little exercise" which discloses little. *People v. Williams*, 29 Cal.3d 392, 401, 628 P.2d 869, 873, 174 Cal.Rptr. 317, 321 (1981) (citing B. Babcock, *Voir Dire: Preserving "Its Wonderful Power,"* 27 Stan.L.Rev. 545, 549 (1975)).

■■■ In this case, the defense attorney might have wished to conduct a broad voir dire for several possible reasons. Heidi's death had generated substantial pretrial publicity, and the trial took place when the citizens of Utah were especially concerned about issues of child abuse and child sexual abuse. "The brutal killing of a three-year-old child naturally evokes deep and powerful feelings of revulsion and abhorrence which are common to all." *State v. Tanner*, 675 P.2d at 551 (Stewart, J., dissenting). Under the circumstances, a broad voir dire is particularly warranted. "[S]uch cases are precisely those in which it is most important to ... prevent the insinuation of prejudice into the truth-finding processes of the courts." *Id.* Furthermore, the State's case was wholly circumstantial, and while the jury could, and did, find guilt beyond a reasonable doubt, the proof of who committed the homicide was not as compelling as in some cases.

■■■ The difficulty in this case is that the defendant has not demonstrated that he was prevented from asking proper questions. The defendant argues that the trial court, in an off-the-record ruling, limited counsel to the three general questions referred to above. In the first place, the record does not establish that the trial court made such a ruling. If, as contended, the ruling was made in an off-the-record bench conference, the defendant should have requested that a record be made of the ruling or, in the alternative, prepared a statement of the proceedings according to Rule 11(g), Rules of Utah Supreme Court. The defendant failed to do either.

Second, the record clearly indicates that defense counsel in fact asked a number of questions that were unrelated to those three questions in voir dire and explored areas outlined in defense counsel's worksheets.

Apparently the defendant's claim is that counsel refrained from asking unspecified voir dire questions. The record simply does not demonstrate that the trial judge prevented counsel from exploring certain topics. The defendant's voir dire worksheets included some topics which were legitimate subjects of inquiry, some of which were, in fact, raised. Even if the

trial judge initially indicated that voir dire would be limited, the trial judge did not limit the defendant to the few questions counsel suggests. In short, the alleged error is unsupported by the record before us. *See State v. Wulffenstein*, 657 P.2d 289, 293 (Utah 1982), *cert. denied*, 460 U.S. 1044, 103 S.Ct. 1443, 75 L.Ed.2d 799 (1983).

### III.  ADMISSIBILITY OF PROSECUTOR'S LETTER

The defendant argues that the trial judge erred by refusing to allow the defendant to call the prosecutor as a witness and by not allowing portions of the letter written to the trial judge by the prosecutor to be admitted into evidence as representative admissions of a party opponent.[1] The trial judge ruled that the evidence was not probative enough to warrant requiring the prosecutor to testify.

The defendant's challenge raises several subissues: (1) whether the proposed testimony of the prosecutor or his statements in the letter to the trial judge were relevant; (2) whether a prosecutor's statement, made in his capacity as a lawyer for the State, is admissible against the State as a representative admission; and (3) whether the trial judge erred in refusing to permit the defendant to call the prosecutor as a witness. We deal with these subissues in that order.

It is first necessary to place the prosecutor's letter in the proper context so that its true significance can be determined. Much of the prosecution's case against Scott Worthen consisted of battered child syndrome evidence. The prosecutor called medical experts and family members to testify about the nature and extent of injuries that Heidi had suffered. Worthen made no

serious attempt at trial to dispute the battered child evidence. His defense was that he was not the batterer.

In the absence of a reasonable explanation for the injuries, the evidence of injuries showing battered child syndrome is admissible to rebut a claim of accidental injury. However, "evidence regarding the child's physical condition does not directly indicate the culpability of any particular defendant." *State v. Tanner*, 675 P.2d at 543. Battered child syndrome evidence is not by itself probative of who did the battering and, without additional evidence, would be inadequate as a matter of law to convict. There must be some evidence that the defendant charged with the crime was the person who inflicted the injury.

Setting aside the ultimate issue of admissibility for the moment, we conclude that the prosecutor's testimony and his letter were relevant because they indicate a lack of evidence on a key point by someone who should have known what the evidence would prove and who had apparently personally undertaken an independent investigation to determine who had committed the fatal act.[2] Although the letter states that the State had no direct or circumstantial evidence indicating that Scott Worthen committed any of the acts upon which the battered child syndrome testimony was based, the letter also states: "The only evidence that the State can offer is that there was no abuse prior to the time that Scott Worthen moved into the home, and that after Scott Worthen moved into the home there was substantial abuse." Although not strong, that was some evidence. Taken as a whole, the probative value of the prosecutor's letter was not highly persuasive, but it was relevant under Rule 401, Utah Rules of Evidence.[3]

---

**1.** Rule 801(d)(2)(D) of the Utah Rules of Evidence defines as nonhearsay what traditionally has been defined as hearsay, but has been admissible as an exception to the hearsay rule. The hearsay exception has been called an admission of a party opponent. We continue to use that terminology, but with the understanding that such evidence is deemed nonhearsay.

**2.** The defendant also asserts in his brief that the prosecutor interviewed some fifty witnesses to

determine whether they had seen the defendant commit acts of child abuse. There is, however, no record support for the allegation. This point is discussed *infra*.

**3.** If that had been all the evidence at trial pointing to the defendant as the perpetrator, it is doubtful whether that evidence would have been sufficient to convict; but the medical examiner's testimony, together with the evidence showing Heidi's eating pattern and when she started showing signs of distress, provided evi-

The defendant asserts that the prosecutor's statements should have been allowed into evidence as an admission of a party's representative. Statements made by a party's representative who is authorized to speak for the party are admissible under Rule 801(d)(2)(C), as are statements by an agent or servant made during the existence of the relationship concerning a matter within the scope of his agency or employment. Utah R.Evid. 801(d)(2)(D). Both kinds of statements are generally admissible as nonhearsay.

We turn now to the issue of whether the out-of-court statements of a prosecuting attorney are admissible under Rule 801(d)(2) as representative admissions. The general rule is that statements made by an attorney concerning any matter within the scope of his authority are admissible. *Oscanyon v. Arms Co.*, 103 U.S. 261, 263, 26 L.Ed. 539 (1880); *Williams v. Union Carbide Corp.*, 790 F.2d 552, 555–56 (6th Cir.), *cert. denied*, 479 U.S. 992, 107 S.Ct. 591, 93 L.Ed.2d 592 (1986); *United States v. Martin*, 773 F.2d 579, 583 (4th Cir.1985); *United States v. McKeon*, 738 F.2d 26, 30 (2d Cir.1984); *United States v. Margiotta*, 662 F.2d 131, 142 (2d Cir.1981), *cert. denied*, 461 U.S. 913, 103 S.Ct. 1891, 77 L.Ed.2d 282 (1983); *United States v. D.K.G. Appaloosas, Inc.*, 630 F.Supp. 1540, 1564 (E.D.Tex.1986), *aff'd*, 829 F.2d 532 (5th Cir.1987), *cert. denied sub nom., One 1984 Lincoln Mark VII v. United States*, — U.S. —, 108 S.Ct. 1270, 99 L.Ed.2d 481

(1988). Some earlier cases held the out-of-court statements of an attorney inadmissible.[4] *People v. Kinder*, 122 Cal.App.2d 457, 265 P.2d 24 (1954); *Jackson v. Schine Lexington Corp.*, 305 Ky. 823, 205 S.W.2d 1013 (1947); *State v. Nichols*, 236 Or. 521, 388 P.2d 739 (1964); *Hogenson v. Service Armament Co.*, 77 Wash.2d 209, 461 P.2d 311 (1969). However, "[t]he later cases, properly it seems, measure the authority of the attorney to make out-of-court admissions by the same tests of express or implied authority as would be applied to other agents...." E. Cleary, *McCormick on Evidence* § 278, at 791 (3rd ed. 1984) (hereinafter *McCormick*) (footnotes omitted). *See State v. Stiltner*, 61 Wash.2d 102, 377 P.2d 252 (1962), *cert. denied*, 380 U.S. 924, 85 S.Ct. 928, 13 L.Ed.2d 810 (1965).

Nevertheless, it has been held that admissions of government agents generally are not admissible. *United States v. Santos*, 372 F.2d 177 (2d Cir.1967), created an exception to the general rule of representative admissions and held that admissions of a government agent are not admissible against the government in a criminal case. That exception has been applied by at least two other circuits in criminal cases. *See United States v. Pandilidis*, 524 F.2d 644 (6th Cir.1975), *cert. denied*, 424 U.S. 933, 96 S.Ct. 1146, 47 L.Ed.2d 340 (1976); *United States v. Powers*, 467 F.2d 1089, 1095 (7th Cir.1972), *cert. denied*, 410 U.S. 983, 93 S.Ct. 1499, 36 L.Ed.2d 178 (1973).[5]

dence that it was the defendant who must have been with her at the time the fatal injury was inflicted.

4. Two of the cases discussed at length in Justice Howe's opinion, *People v. Kinder*, 122 Cal. App.2d 457, 265 P.2d 24 (1954), and *State v. Nichols*, 236 Or. 521, 388 P.2d 739 (1964), involve statements made by an attorney during an opening statement and during oral argument on a motion. Juries are routinely cautioned that such statements are not to be considered as evidence. The context in which the statements in these two cases were made is important and is quite different from the context in which the statements in this case were made.

5. It is not clear whether these cases survive the federal rules. In *United States v. Morgan*, 581 F.2d 933 (D.C.Cir.1978), the United States Court of Appeals for the District of Columbia Circuit considered whether the admissions of a govern-

ment informant were adoptive admissions under Federal Rules Evidence. 801(d)(2)(B). The government argued that Rule 801(d) did not apply to the prosecution in a criminal case. The court noted that neither *Pandilidis, Powers*, nor *Santos* was decided under the federal rules and stated that there was "no indication in the history of the rules that the draftsmen meant to except the government from operation of Rule 801(d)(2)(D) in criminal cases." 581 F.2d at 938 n. 15. However, *United States v. Kampiles*, 609 F.2d 1233 (7th Cir.1979), *cert. denied*, 466 U.S. 954, 100 S.Ct. 2923, 64 L.Ed.2d 812 (1980), rejected the statements in *Morgan* concerning the admissibility of a government agent's statements in a criminal case under the federal rules and held that the exception for government agents created by the *Santos* line of cases applied, notwithstanding the federal rules. *See also United States v. D.K.G. Appaloosas, Inc.*, 630 F.Supp. 1540, 1564 (E.D.Tex.1986), *aff'd*, 829

The nonadmissibility of statements of government agents is based on the rationale that "[b]ecause the agents of the Government are supposedly disinterested in the outcome of a trial and are traditionally unable to bind the sovereign, their statements seem less the product of the adversary process and hence less appropriately described as admissions of a party." *United States v. Kampiles*, 609 F.2d 1233, 1246 (7th Cir.1979), *cert. denied*, 466 U.S. 954, 100 S.Ct. 2923, 64 L.Ed.2d 812 (1980) (citations omitted). Clearly, that rationale finds no basis in fact when the government agents are involved in law enforcement work. The rationale is even more lacking in the case of statements made by the prosecutor in a criminal case.[6]

*Kampiles* does not, in any event, compel the conclusion that the prosecutor's admissions in a criminal case should be excepted from Rule 801(d)(2)(D). The issue in *Kampiles* was the admissibility of statements of a CIA agent rather than of statements of a prosecutor, and none of the cases relied upon by *Kampiles* concerned statements of prosecutors. *See, e.g., Pandilidis*, 524 F.2d at 650 (statements of an IRS agent that he believed defendant guilty of nothing more than a civil offense); *Powers*, 467 F.2d at 1095 (statement of IRS agent that proceeds were taxable income of co-defendant); *Santos*, 372 F.2d at 179 (sworn statement of a narcotics agent that he had witnessed the assault and that persons other than defendant were responsible for it). As noted by Professor McCormick, "The cases ruling against admissibility involve statements by agents at the investigative level, with statements by government attorneys after the initiation of proceedings being held admissible." *McCormick*, § 267, at 795.

Here, the case was beyond the investigatory state; in fact, it was being tried for the second time. As a practical matter, the prosecutor was vigorously pursuing the State's interest in prosecuting the defendant. The prosecutor can hardly be considered a disinterested party or his statements any less an admission on the State's part than the statements of any other attorney. Furthermore, while other agents may be unable to bind the State, prosecutors certainly do have authority to bind the State by formal judicial, as opposed to evidentiary, admissions. Consequently, we believe that the admissibility of the prosecutor's statement under Rule 801(d)(2)(D) should be judged by the same standard that is applicable to other lawyers. *See generally State v. Williams*, 656 P.2d 450 (Utah 1982); R. Boyce & E. Kimball, *Utah Rules of Evidence 1983—Part II*, 1987 Utah L.Rev. 467, 478.

The prosecutor's statements in his letter to Judge Roth were within the scope of his authority. He had authority to manage and prosecute the State's case against the defendant. His statements to Judge Roth directly concerned the management of the case. Furthermore, the prosecutor's statements were admissible even though they stated the prosecutor's opinion. Neither the fact that an admission contains an opinion nor the fact that an admission is based on hearsay is sufficient ground for holding such a statement inadmissible. *MCI Communications Corp. v. American Tel. & Tel. Co.*, 708 F.2d 1081 (7th Cir.), *cert. denied*, 464 U.S. 891, 104 S.Ct. 234, 78 L.Ed.2d 226 (1983); *Mahlandt v. Wild Canid Survival & Research Center, Inc.*, 588 F.2d 626 (8th Cir.1978). The State argues that the prosecutor's statements in the letter to Judge Roth should not have been admitted because they were erroneous and not to be read literally. However, at the time the trial judge had to make his ruling, he could not have known that the statement would prove to be erroneous, and in any event, the accuracy of the admission would have been for the jury to determine.

---

F.2d 532 (5th Cir.1987), *cert. denied sub nom., One 1984 Lincoln Mark VII v. United States*, —— U.S. ——, 108 S.Ct. 1270, 99 L.Ed.2d 481 (1988) (citing *Santos*).

6. "[T]he reasoning [of *Kampiles*] is suspect, since no corporate defendant in a criminal case wants agents' statements used against it either; but they are so used." S. Saltzberg & K. Redden, *Federal Rules of Evidence Manual*, rule 801, at 776 (4th ed. 1986).

Nevertheless, the prosecutor's letter did little more than refer to some of the evidence that in fact would later be admitted against the defendant at trial. The language that characterized the evidence on the issue of identity was an opinion that, if correct, would have required a dismissal or a directed judgment of acquittal. In actuality, the opinion would have added nothing to the facts the jury heard. The jury was, of course, able to evaluate the evidence by itself, and there is no evidence in the record that the jury was misled by not hearing the prosecutor's testimony or knowing about the relevant part of his letter. The jury considered all the evidence against the defendant, and we cannot now conclude that the prosecutor's characterization of that evidence, which later proved to be erroneous, would have made any difference had it been admitted.

Beyond that, we note that a prosecutor or other trial attorney may not be called to testify whenever he may be the source of some relevant testimony. A rule permitting one side to call at will the attorney for the other side as a witness would be incalculably disruptive to the judicial system and oppressive to the opposing side. The Colorado Supreme Court observed in *Riboni v. Dist. Ct.*, 196 Colo. 272, 274, 586 P.2d 9, 11 (1978):

> Every prosecutor who participates directly in interviewing and otherwise investigating his cases subjects himself to the risk of being called as a witness. But to allow opposing counsel the unfettered option of removing any prosecutor who has personal knowledge of a material fact in the case might well result in restricting the prosecution function to the ill-prepared.

In *State v. Williams*, 656 P.2d 450, 453 (Utah 1982), we stated, "A trial court has the authority to refuse to allow lawyers, including prosecuting attorneys, to be called as witnesses by the adverse party unless the result would be to prejudice the defendant's case." *But see State v. Leonard*, 707 P.2d 650 (Utah 1985).

Nevertheless, a defendant's constitutional right to compel witnesses to testify for him may not be dispensed with because of some comparatively minor inconvenience to the State or because of defense counsel's truly inadvertent failure to give prompt notice, when an attorney's testimony may be important. But if the prosecutor's testimony is cumulative or could be easily obtained from an alternative source or if calling the prosecutor is simply a ploy to disrupt the prosecution, a trial court need not allow the prosecutor to be called when the consequence would be his disqualification. *Williams*, 656 P.2d at 453; *accord State v. Harding*, 137 Ariz. 278, 670 P.2d 383 (1983), *cert. denied*, 465 U.S. 1013, 104 S.Ct. 1017, 79 L.Ed.2d 246 (1984).

The defendant here did not move to call the prosecutor as a witness until the opening day of trial. Had the motion been granted, the prosecutor would have been disqualified, *Leonard*, 707 P.2d at 654; *Williams*, 656 P.2d at 453, and another prosecutor would have been required to take over. In such circumstances, either the new prosecutor would have to proceed to trial unprepared or the case would have to be continued. Given the apparently unimportant nature of the testimony the prosecutor had to give, the trial judge did not err in refusing to allow the prosecutor to be called as a witness.

## IV. PROSECUTION'S DUTY TO DISCLOSE EXCULPATORY EVIDENCE

The defendant demanded all exculpatory and mitigatory evidence from the State. He properly asserts that the prosecution had a duty to disclose such evidence. *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963); *State v. Jarrell*, 608 P.2d 218 (Utah 1980); Utah Code Ann. § 77-35-16(a) (1982). Indeed, due process requires the State to disclose even unrequested information which is or may be exculpatory. *State v. Carter*, 707 P.2d 656, 662 (Utah 1985). A *Brady* request for information is deemed a continuing request. *Id.*

The defendant contends that the prosecuting attorney testified as a witness in the trial of the defendant's wife, Kathleen

Worthen, eleven days after the defendant's own trial. At that trial, the prosecutor testified that he had interviewed approximately fifty people, none of whom had seen Scott Worthen commit any act of child abuse. The defendant made this assertion in a memorandum in support of a motion for a new trial and stated that a transcript of the prosecutor's testimony would be submitted to the trial court. The transcript, if ever it was submitted, is not in the record in this appeal; nor is there an affidavit of counsel describing any such evidence. Accordingly, we are unable to evaluate whether there was evidence that was exculpatory and should have been disclosed to the defendant.

■ Although a prosecutor has a high duty to act fairly in conducting a criminal prosecution, he is not required to account to the defense attorney for every investigatory move. *See People v. Buss*, 112 Ill. App.3d 311, 68 Ill.Dec. 250, 445 N.E.2d 894 (1983). If the prosecutor did interview fifty witnesses who stated that they had not seen the defendant abuse Jodi or Heidi, the prosecutor's evidence of those interviews is not necessarily evidence that he was required to disclose. Whether such evidence was exculpatory would depend on such factors as whether any of the persons interviewed were in a position to observe the behavior of the defendant toward the children under conditions where abuse might have been expected, given the fact that abuse did occur. Such evidence might have been sufficiently exculpatory to require the prosecutor to disclose that evidence. *United States ex rel. Meers v. Wilkins*, 326 F.2d 135 (2d Cir.1964). *See, e.g., In re Chol Soo Lee*, 103 Cal.App.3d 615, 163 Cal. Rptr. 204 (1980). We reiterate the position which we enunciated in *State v. Carter*, 707 P.2d at 662, that "due process requires a prosecutor to disclose even unrequested information *which is or may be* exculpatory." (Emphasis added.) But, as noted, the defendant has not provided us a basis for determining whether the evidence that the prosecutor could have given was exculpatory. Accordingly, we find no error on this point.

## V. NEWLY DISCOVERED EVIDENCE

The defendant also asserts that the trial court erred in denying his motion for a new trial under Rule 24, Utah Rules of Criminal Procedure. The defendant asserts that the new trial should have been granted on grounds of both surprise and newly discovered evidence.

■ The defendant asserts that he was surprised by Dr. Ryser's rebuttal testimony which gave several examples of the magnitude of the force necessary to transect a duodenum. The examples all involved the use of significant force. Although Dr. Ryser testified that she had no previous experience with such an injury, her rebuttal testimony was inconsistent with her prior testimony that the injury could have been caused by a comparatively minor force, such as a sibling's push.

In the first trial of the case, Dr. Ryser testified that significant force was necessary to cause such an injury. The substance of Dr. Ryser's testimony in the second trial was the same. However, the illustrations she used on rebuttal may well have been improper because they were without any valid foundation, but the defendant should have objected when the testimony was given. Nevertheless, examples of the type of force necessary—even if inappropriate—do not constitute the kind of surprise that justifies a new trial. A party is not entitled to know in advance of trial the exact script of each witness's testimony. In short, the trial court did not abuse its discretion in denying the motion for a new trial on the ground of surprise. *See State v. Conrad*, 590 P.2d 1264 (Utah 1979); *State v. Draper*, 83 Utah 115, 27 P.2d 39 (1933); *State v. Weaver*, 78 Utah 555, 6 P.2d 167 (1931); *State v. Mellor*, 73 Utah 104, 272 P. 635 (1928).

■ Nor is the defendant entitled to a new trial on the ground of newly discovered evidence. The "new" evidence was "evidence" that an adult woman had suffered a perforated duodenum when an automobile she was driving hit a parked car at a speed of ten miles per hour or less. The damage

to the car was only a broken headlight, but an hour and a half later the woman passed out, was admitted to a hospital, and was released. It was three weeks later that her injury was discovered. Thus, the evidence was of an accident which occurred many years previously and caused a less severe injury.

To justify a new trial, newly discovered evidence should clarify a fact that was contested and resolved against the movant, *State v. Cooper*, 114 Utah 531, 201 P.2d 764 (1949), or be sufficiently persuasive that the result of the trial might be changed, *State v. Swain*, 541 P.2d 5 (Utah 1975). Generally, newly discovered impeachment evidence does not ordinarily warrant a new trial. *See State v. Brown*, 48 Utah 279, 288, 159 P. 545, 549 (1916) (Frick, J., dissenting). *See also United States v. Solimine*, 536 F.2d 703 (6th Cir. 1976), *cert. denied*, 430 U.S. 918, 97 S.Ct. 1333, 51 L.Ed.2d 596 (1977); *United States v. Myers*, 534 F.Supp. 753 (E.D.N.Y.1982). At best, the evidence in this case had minor impeachment value and therefore did not justify a new trial.

## VI. SUFFICIENCY OF EVIDENCE

■ The defendant argues that the trial court erred in not dismissing the case for insufficient evidence prior to submitting the case to the jury. We disagree.

The evidence was sufficient to justify the jury's verdict. The evidence is circumstantial as to when the fatal blow was struck and as to who struck it, but Dr. Ryser's testimony supports the jury's finding that the approximate time of the injury was twelve hours prior to Heidi's death, that is, after Kathleen, the mother, left for the spa and before she returned home. The jury may also have found that the defendant was the only person with the child at the time the fatal blow was inflicted. Although Dr. Moore provided conflicting evidence as to the time of injury, that the initial injury to the duodenum may have occurred about seventy-two hours prior to the victim's death, it was within the province of the jury to reject that testimony and accept the testimony of Dr. Ryser.

In short, the trial court did not err in refusing to dismiss the charge of second degree murder against the defendant.

AFFIRMED.

HALL, C.J., concurs.

HOWE, Associate Chief Justice (concurring and dissenting):

I concur, except I dissent as to that portion of part III of the lead opinion which holds that the prosecutor's statements in his letter to Judge Roth are admissible as representative admissions against the State. The statements do not concern a material fact and are not relevant to the jury's inquiry. Further, the lead opinion would allow the jury to give a strained and distorted interpretation to the statements.

Although the letter was imprecisely worded, its fair import was that the prosecutor had no direct but only some circumstantial evidence that the defendant could have committed the abuse. As such, the prosecutor's statements were simply his honest appraisal of his case at that point. The lead opinion agrees that "the prosecutor's letter did little more than refer to some of the evidence against the defendant." It did not rise to an admission since it did not concern a material fact which the prosecutor had to prove and on which the defendant had to produce evidence. Whether the evidence against the defendant was direct or circumstantial was not an issue at trial. This case had been previously tried, and counsel for both sides knew that the State's evidence was only circumstantial. At trial, the State did not produce any direct evidence and the defendant's counsel did not claim any surprise. There are statements which a prosecutor could make prior to trial which would amount to an admission of a material fact, but his frank and professional appraisal of the evidence he expects to produce certainly is not one.

Case law does not support the lead opinion's conclusion that the prosecutor's statement in his letter was erroneously excluded. The cases dealing with the admissibility of an admission made prior to trial by an

attorney for a party outside the courtroom are in some conflict. *Wenner v. Gulf Oil Corp.*, 264 N.W.2d 374 (Minn.1978); *Gibson v. Metropolitan Life Ins. Co.*, 147 S.W. 2d 193 (Mo.Ct.App., St. Louis 1941). However, they are unanimous in requiring that the admission be one of fact material to the dispute of the parties. Thus, courts have held admissible an acknowledgment of indebtedness by an attorney for a debtor, *Suntken v. Suntken*, 223 Iowa 347, 272 N.W. 132 (1937); *Brown v. Hebb*, 167 Md. 535, 175 A. 602, 97 A.L.R. 366 (1934), and a statement in a letter written by an attorney for a plaintiff that the defendant's employee (not the defendant) assaulted him. *Noel v. Roberts*, 449 S.W.2d 572 (Mo.1970). Similarly, a statement in a letter of claim written by an attorney for the plaintiff setting forth the basis of the claim which presented a theory of liability entirely different from the theory presented by the claimant in a subsequent action was held admissible. *Gibson v. Metropolitan Life Ins. Co.*, *supra*. On the other hand, it was held in *Hogenson v. Service Armament Co.*, 77 Wash.2d 209, 461 P.2d 311 (1969), that a statement by a plaintiff's attorney in a letter of claim to the defendant as to how the plaintiff's injury occurred which was inconsistent with the plaintiff's later theory presented at trial was inadmissible.

The cases are also unanimous that legal conclusions, matters of law, and opinions expressed by attorneys are not admissible against their clients. Thus, in *Kansas City v. Martin*, 391 S.W.2d 608, 615 (Mo.Ct.App. 1965), the attorney for the plaintiff in a tort action stated that the plaintiff was liable for his hospital bills. In a subsequent action brought against the plaintiff to recover the hospital bills, his attorney's statement was held inadmissible. Said the court:

> [T]he authority of an attorney is limited to statements or admissions of fact, and neither the client nor the court is bound by the attorney's statements or admissions *as to matters of law or legal conclusions.* 7 C.J.S. *Attorney and Client* § 100, p. 922. It is also recognized that improvident or erroneous statements or admissions resulting from unguarded expressions or mistake should not be binding on the client. 7 C.J.S. *Attorney and Client* § 100, p. 922; *Couch v. Landers*, 316 S.W.2d 588 (Mo.1958).

(Emphasis added.)

Two cases cited by but not relied on in the lead opinion support the rule that legal conclusions, matters of law, and opinions expressed by attorneys are not admissible against their clients. Thus, in *People v. Kinder*, 122 Cal.App.2d 457, 265 P.2d 24 (1954), the court held that it was error for the trial court to allow a deputy district attorney to read into evidence a remark made by the defendant's counsel in his opening statement to the jury at a former trial which allegedly conflicted with counsel's opening statement in the second trial. Said the court: "The mere argument of counsel is not evidence and is not admissible as such unless made as a factual admission formally made and entered in the course of a trial." *Kinder*, 265 P.2d at 28. That case was relied upon in *State v. Nichols*, 236 Or. 521, 388 P.2d 739 (1964), a case very close in its facts to the instant case. There, the defendant called the district attorney as a witness and attempted to force him to admit that during oral argument concerning the sufficiency of an earlier indictment which had been dismissed by the court, the district attorney had said: "The State cannot honestly say that this defendant aimed that rifle at his wife and pulled the trigger intending to kill her." The court held that the exclusion of that statement from evidence was proper, stating:

> The opinion expressed by the attorney during the earlier proceeding while arguing a matter of law was no more relevant to prove the facts in the subsequent trial than it would have been if the attorney instead had expressed his enthusiastic personal belief in the guilt of the accused and the state were trying to place that opinion before the jury.

*Nichols*, 388 P.2d at 746.

The lead opinion dismisses *Kinder* and *Nichols* as being "earlier" cases (they were decided in 1954 and 1964) which are not in accord with more recent case law. While my research and reading reveal that a

more liberal approach to the admissibility of admissions of attorneys is being proposed by the lead opinion today than in past years, there has been no liberalizing of the rule against admitting statements of attorneys which are legal conclusions, matters of law, or an attorney's opinion or characterization of the evidence he expects to produce at trial. The lead opinion cites *State v. Stiltner*, 61 Wash.2d 102, 377 P.2d 252 (1962), with apparent approval, but in that case, defense counsel attempted to call the prosecutor as a witness for a purpose far different than in the instant case. There, the credibility of the State's main witness was an issue, and the court held that the prosecutor could be called to testify as to the State's treatment of him before trial and whether that treatment amounted to coercion or intimidation and thus affected his testimony. That case did not involve calling the prosecutor to testify as to the weakness of his case or the quality of his evidence, as was attempted here.

The prosecutor's assessment or characterization of his evidence made by him before trial is not relevant at trial. The jury should not decide the case on the basis of either the prosecutor's or defense counsel's personal opinion or judgment. Indeed, the jury is instructed to decide the case on the evidence and not on statements of counsel. The defendant's right not to have a case submitted to the jury when there is no evidence of his guilt is protected by a motion to dismiss made by the defendant at the close of the State's case. This was done here. The motion was denied. The lead opinion agrees that the motion was properly denied. Yet the lead opinion sanctions the highly incongruous result of the trial court's allowing into evidence the prosecutor's letter to prove that the State had "no evidence" against the defendant when the court had just ruled at the close of the State's case that, as a matter of law, there was sufficient evidence of his guilt for the jury to convict him. The lead opinion asserts that "at the time the trial judge had to make his ruling [on the admissibility of the prosecutor's statements], he could not have known that statement would prove to be erroneous." This is not true.

The trial judge had just ruled at the close of the State's case in chief that there was sufficient evidence as a matter of law to take the case to the jury. It completely eludes me why at that point in the trial it was relevant and material for the jury to hear that before the trial the prosecutor had stated that his evidence against the defendant was circumstantial. Curiously, the lead opinion states that the prosecutor's statement "may have been based in part on the out-of-court statements of some fifty witnesses he interviewed." But its footnote 2 points out that there is no record support for this allegation, and part IV of the opinion reiterates that there is nothing in the record on appeal to support that supposition, not even an affidavit of counsel. I therefore do not think that the reference to such phantom evidence can be properly relied upon as a basis for the admission of the prosecutor's letter into evidence.

Furthermore, it requires a strained interpretation of the letter to conclude that the prosecutor meant he had "no evidence." The fair import was that he had no direct evidence, only circumstantial. See *Huntsville Irrigation Association v. Rollo*, 56 Utah 442, 191 P. 423 (1920), where this Court refused to give a strained interpretation to a statement made by the plaintiff's attorney while conducting cross-examination which would have conceded the very right which the action was commenced to enforce. The same is true in the instant case. The prosecutor's language should not be unfairly interpreted to concede the very basis of the State's case. I do not agree with the lead opinion wherein it states that the prosecutor's letter should be given to the jury for them to make out of it anything they wish.

Statements of the nature made here by the prosecutor are commonly made in pretrial exchanges and many times form the basis for reaching a plea agreement. This openness and frankness by prosecutors should be encouraged. We have on many occasions reminded prosecutors that their principal objective should be to see that justice is served and not to obtain convic-

**854**

tions at all cost. Prosecutors generally open their files to defense counsel for discovery. The lead opinion would have the prosecutor's pretrial statement of the type of evidence he expects to produce used as an admission against the State, chilling our efforts to promote that openness. Justice Durham and Justice Zimmerman join my opinion. Otherwise, prosecutors would be well advised to guard their every statement to the trial judge and defense counsel lest it later be used as an admission against the State and the prosecutor is called to testify for the defendant.

DURHAM and ZIMMERMAN, JJ., concur in Associate C.J. HOWE's concurring and dissenting opinion.